ALLISON *et al.* v. BRYAN.

No. 2049, Okla. T.   Opinion Filed June 25, 1908.

(97 Pac. 282.)

1.  **BASTARDS — Legitimation—Acknowledgement—Reception into
    Family.** Under the terms of section 36, art. 2, *c.* 59 (section
    3795) Wilson's Rev. & Ann. St. 1903, the father of an illegiti-
    mate minor child, by publicly acknowledging it as his own,
    receiving it as such, with the consent of his wife, if he be
    married, into his family, and otherwise treating it as if it
    were a legitimate child, thereby adopts or legitimates such
    child, and it acquires the legal status of a legitimate child from
    birth.

2.  **SAME—Consent of Mother Unnecessary.** Such father, desir-
    ing to so legitimate or adopt such child, may do so without
    the consent and against the will of the mother.

3.  **SAME—Effect of Legitimation—Custody—Rights of Father.**
    When such legitimation or adoption takes place, all the re-
    ciprocal responsibilities and duties between a father and a le-
    gitimate child obtain between him and such adopted child, and
    he is charged with its support and education, and is entitled
    to its custody, services, and earnings.

(Syllabus by the Court.)

*Error from District Court, Cleveland County; C. F. Irwin, Trial
Judge.*

Petition by Anna Bryan for a writ of *habeas corpus*, to re-
cover the custody of Kenner Whittaker Allison, Jr., a minor,
against Kenner Whittaker Allison, Sr., and another. From
a judgment of the district court awarding the minor to pe-
titioner, on appeal from a probate court decree denying such re-
lief, defendants bring error. Reversed and remanded.

Anna Bryan, defendant in error, on the 14th day of Feb-
ruary, 1906, filed in the office of the probate court of Cleveland
county her petition and application for a writ of *habeas corpus,*
for the purpose of recovering the custody of Kenner Whittaker

Allison, Jr., a minor, in which she alleged that said child was of the age of three years, and was the illegitimate child of herself and K. W. Allison, Sr., who, with his wife, Mary G. Allison, wrongfully, unlawfully, and forcibly had taken possession of said minor child, and were keeping him at their home in said county, and depriving her, the mother, of its custody.

A writ was issued on this application, and a return made thereon, in which the substantial allegations material to the issues on the final trial were as follows: That at the time of the issuance of said writ the said respondents had had the possession of said child for a period of 15 months; that said possession was in all respects legal, and with the full knowledge and consent of the mother, the said petitioner; that in the month of October, 1904, in the city of Oklahoma City, it was mutually agreed by and between the said mother and the said respondent K. W. Allison that the care, custody, and education of said minor child should be intrusted to the respondents named, and that, in pursuance of said agreement, the child was delivered by the mother to them, and taken to their home in Cleveland county, and had until recently been in the peaceful and undisputed possession of said respondents, with the full knowledge and consent of petitioner. It was further alleged that the mother was not a proper person to have the care, custody, and training of her said child, and that respondents were, and were financially able to give the same a comfortable home, and to properly provide and care for it.

The foregoing recites substantially the material issues on which the case was finally tried and judgment rendered.

The cause was tried before the probate court, and the child was awarded to the custody of respondents. Thereupon petitioner appealed the same to the district court, and on a trial of the cause, and after a full hearing, there was rendered a judgment awarding the child to petitioner, Anna Bryan, its mother, with the proviso that the respondents should be permitted to visit it, and it to visit them, under restrictions recited in the decree, and the costs of the proceeding were taxed to the respondents, who

took the cause to the Supreme Court of the territory of Oklahoma by proceedings in error, and it is now before us for consideration.

*C. M. Keiger* and *Shartel, Keaton & Wells,* for plaintiffs in error.

*Mosier & Dudley, Crockett & Johnson,* and *Howard & Fulton,* for defendant in error.

DUNN, J. (after stating the facts as above). . Section 36, art. 2, c. 59 (section 3795) Wilson's Rev. & Ann. St. 1903, provides:

"The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this article do not apply to such an adoption."

On the trial of this cause in the district court it was agreed between the parties "that prior to the commencement of this action, the respondent K. W. Allison, Sr., had taken the minor child, to recover possession of which this action is brought, into his home, with the consent of his wife, and had acknowledged the child to be his child, and had treated it as a legitimate child, but that at no time was the possession of said child by the said K. W. Allison, Sr., with the consent of the petitioner." Section 6, art. 1, c. 59 (section 3765) Wilson's Rev. & Ann. St. 1903, provides: "The mother of an illegitimate unmarried minor is entitled to its custody, services and earnings." Defendant in error in the brief filed states the position taken as follows:

"We do not contend, and never have contended, that the consent of the mother is necessary to perfect the child's legitimation. The statute being for the benefit of the child, it would be repugnant to hold that the mother could, by withholding her consent, deprive the child of the benefits the statute affords. * * * Again, it is immaterial under the statute how long the father

keeps the child in his family. If he acknowledges that it is his child, takes it into his family, with the consent of his wife, keeps it there for five minutes, or even one minute, it is sufficient to perfect the child's legitimation. It is plain that the statute does not require or contemplate a permanent separation of the mother and child, nor that the permanent custody of the child by its putative father shall be necessary to complete and perfect its legitimation. So in no way is it necessary, in order to carry into effect the provisions of this statute, that the right of the mother to the custody of her child be disturbed."

We believe that the evidence shows that either party is qualified to properly raise and care for the child, but the respondents, having taken possession of it, and claiming the right to its control and custody, and the mother contesting this right under section 6, above quoted, create an issue whose outline is marked by the citations from the statute, the admission made on the trial, and the quotation from the brief before us. The mother contends that, by reason of the fact that the child is illegitimate, unmarried, and a minor, the statute gives her the unqualified right to its custody, services, and earnings. The father, on the other hand, contends that by reason of having complied with section 36, above quoted, his right of possession is unqualified and absolute. Petitioner, as is seen, argues that, if the father of the child takes it into his family with the consent of his wife, and keeps it there for five minutes, or even one minute, it is sufficient to perfect the child's legitimation, and that this would accomplish the purpose, end, and aim of the statute, and give full force and effect to that statute, and also to the one under which the mother claims. In support of this argument, our attention is called to a number of authorities declaring the well-recognized rule of statutory construction that, when two conflicting statutes relating to the same subject are susceptible to a construction which will give force and effect to each, it is the duty of courts to adopt such construction. The solution of this will be found in a determination of the meaning, intent, and scope of section 36, which is identical with section 230 of the California Civil Code, in the

construction of which, in the case of *Blythe v. Ayres*, 96 Cal. 532, 31 Pac. 915, 19 L. R. A. 40, the Supreme Court of that state says:

"Before passing to the merits of the discussion, we pause a moment to say that the verb 'adopts,' as used in section 230, is used in the sense of 'legitimates,' and that the acts of a father of an illegitimate child, if filling the measure required by that statute, would result, strictly speaking, in the legitimation of such child, rather than its adoption. Adoption, properly considered, refers to persons who are strangers in blood; legitimation to persons where the blood relation exists. See law dictionaries, Bouvier, Black, Anderson, and Rapalje."

The statute says that, upon compliance with the conditions enumerated, the child is thereupon "deemed for all purposes legitimate from the time of its birth." Wilson's Rev. & Ann. St. 1903, § 5, art. 1, c. 59 (section 3764), provides: "The father of a legitimate unmarried minor child is entitled to its custody, services and earnings." If the acts mentioned make of it a legitimate child, does it not follow that, when such legitimation or adoption takes place, all the reciprocal duties between the father and a legitimate child would obtain between him and such illegitimate or adopted child, and, if so, is he not charged with its support and education, and would he not, *ipso facto,* be entitled to its custody, services, and earnings? Numerous methods have been prescribed by the Legislatures of the different states for the adoption or legitimation of illegitimate children, but in each and all of them it will be found the courts have held that, after the child has been legitimated according to the form prescribed by the statute, it is no longer an illegitimate child for any purpose, but that it is immediately endowed with all of the attributes of a legitimate child.

The case of *Town of Rockingham v. Mount Holly*, 26 Vt. 653, construes the following statute of that state: "If the parents of an illegitimate child intermarry, and recognize and treat such child as their own, it will render the child legitimate, the

same as if born in lawful wedlock"—and holds that "the child will take the settlement of the father, as one of the legal consequences resulting from such act of legitimation.

The state of Louisiana has a statute, which provides:

"A natural father or mother shall have the power to legitimate his or her natural child by an act passed before a notary and two witnesses, declaring that it is the intention of the parent making the declaration to legitimate such child or children."

The case of *Davenport v. Davenport,* 116 La. 1009, 41 South. 240, 114 Am. St. Rep. 575, in construing this statute, holds that a child legitimated by the notarial act mentioned was legitimate for all purposes, and that there were not two classes of legitimate children.

Schouler in his work on Domestic Relations, § 226, states that:

"By the civil and canon laws two persons, who had a child at the fruit of their illicit intercourse, might afterwards marry, and thus place their child, to all intents and purposes, on the same footing as their subsequent offspring, born in lawful wedlock. But the common law, though not so strict as to require that the child should be begotten of the marriage, rendered it indispensable that the birth should be after the ceremony."

However this may have been at common law, its rigor has been modified by many states in providing by statute that the intermarriage of the parents of illegitimate ante-nuptial children legitimates them; and the courts, in construing this statute, hold that such legitimation is for all purposes, and puts the child on a par with children born after wedlock.

In 5 Cyc. p. 634, the following rule is laid down:

"The civil and canon law, in contradistinction to the common law, allowed the subsequent marriage of the parents to legitimate previously born issue, and the statutes of the different states, in mitigating the severity of the common law, have generally adopted this principle."

To the same effect is the rule laid down in 3 Am. & Eng. Ency. Law, p. 895:

"Following the more humane and just rule of the civil law, a large majority of the United States have abrogated the common-law doctrine, and enacted that a subsequent intermarriage of the parents, accompanied by an acknowledgment of paternity on the part of the father, shall legitimate previous issue."

But in all cases where the child is legitimated in the manner prescribed by the statute, it is no longer illegitimate for any purpose. *Adams v. Adams,* 36 Ga. 236; *Jackson's Administrators v. Moore et ux.,* 38 Ky. 170; *Graham v. Bennet,* 2 Cal. 503.

Schouler in his work on Domestic Relations (4th Ed.), under the title of "Illegitimate Children," sets out extensively the rights and disabilities under which bastards labor as such, while continuing illegitimate, showing that their rights were few at common law, and depicting in vigorous language the inferior position which they held. Among these disabilities, they could not inherit from either father or mother, or from any one else; they could have no heirs save those of their own body; while over and above all this hovered the dark stigma of illegitimacy, which was at least presumed to close the social doors against them, and to preclude hope of advancement on an equality with other children. Section 36, it is evident, was passed for the purpose of removing all of these disabilities, without leaving a judicial record behind. It was calculated to give the child a name and a* place in the world, by putting it in a position where it could, by its outward life alone, establish itself in a station of respectability in the eyes of all people. This, it was contemplated, would be accomplished should the father of such child, being a member of a household, and, if married and his wife consenting, open the doors of that home for his unfortunate child. All must concede that the statute is made with the good of the child solely in view, and this all of the authorities assert can be accomplished only by its reception into the home of the father, and there receiving the treatment and yielding the deportment usual between a father and a legitimate child. *Garner v. Judd,* 136 Cal. 394, 68 Pac. 1026; *Palm v. Heaton,* 139 Cal. 237, 73 Pac. 186; *Eddie v. Eddie,* 8

N. D. 376, 79 N. W. 856, 73 Am. St. Rep. 765; *Cebrian v. De Laveaga*, 142 Cal. 158, 75 Pac. 790.

In discussing it, the Supreme Court of the state of California, in the case of *Garner v. Judd*, 64 Pac. 1076, in the syllabus holds:

"Under Civ. Code Cal. § 230, providing that the father of an illegitimate child, by publicly acknowledging it as his own and receiving it into his family, adopts it and makes it, for all purposes, legitimate from the time of its birth, the acknowledging of an illegitimate child by a father without receiving it into his family is not sufficient for its adoption, and such child can confer no right to administer her father's estate."

In a second appeal of this same case, found in 136 Cal. 394, 68 Pac. 1026, in discussing this same statute, and having under consideration the things necessary to be done in order to effect its ends and purposes, the court, through Mr. Justice Beatty, says:

"It is essential to an adoption that the illegitimate child should be received into the family of the father, if he have one. This proposition is not seriously questioned by counsel for appellant, or by *amici curiae,* whose briefs have been filed in the case; but they contend that when the father has no family, there may still be an adoption under section 230, which, they contend, does not impose an impossible condition to the legitimation of children born out of wedlock to fathers who are without homes in which they may be received. This question, however, does not arise in the case. The findings of the superior court are plain that Goodman during the whole period of his daughter's minority, had a home, where he was living with a woman as his wife. The finding, it is true, does not say in direct terms that she was his wife, but there was evidence, unobjected to and uncontradicted, that they were married; and, aside from this, we have no doubt that when a man has a home, where he lives with a woman whom he holds out to the world as his wife, he has a family, within the meaning of section 230, Civ. Code Cal., into which he must receive an illegitimate child in order to legitimate it under that section."

Section 2806 of the Statutes of North Dakota (Rev. Codes

1899) reads the same as section 36 of the article under consideration in the Statutes of Oklahoma, and the Supreme Court of that state, in passing upon the acts essential to legitimate a child under its terms in the case of *Eddie v. Eddie, supra,* after mentioning the sections of the statute which provide for the adoption of a child by a decree of court, and the statute under discussion, says:

"By the latter a father is permitted to adopt his own child, not by public proceedings and by written document, containing and perpetuating the record of his child's disgrace and his own shame, but by voluntarily assuming the usual relation and duties of a father, or, as expressed in the statute, 'publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child.' The adoption in fact is made an adoption in law, and the statute serves the same purpose as the decree, 'and such child is thereupon deemed for all purposes legitimate from the time of its birth.' In short, all of the mutual rights and duties of parent and child are called into being, placing upon the father the legal obligation of care, education, and support, and giving to him the custody of the child, as well as a right to its earnings; while the child so adopted becomes bound to perform all of the duties of a legitimate child."

By the foregoing authorities it will be observed that the criterion by which compliance with the statute is measured is that the child shall be received into the family of the father and treated as if he were a legitimate child. It is impossible to conceive that it contemplates that a child could be legitimated under it and remain elsewhere than in the family of the father. Indeed, in the case of *De Laveaga's Estate, Cebrian v. De Laveaga, supra,* the Supreme Court of California on another occasion, considering this same law, holds that "where the father of an illegitimate child had no family except the child, and paid for his support in another family, but the child never lived with the father at his home, there was no adoption under the statute." The mother of the child in this case was dead. The father brought him to San Francisco, where he lived, and placed him, at his

own expense, in the home of a very respectable old German doctor. The father did not marry, and had no establishment, such as a home of his own, yet the court held, even under these circumstances, there was no legitimation, for the sufficient reason that the end and aim of the statute could not be secured by such an arrangement; the purpose of the act being to place the illegitimate child in a home where it would be received and treated as legitimate, to the end that the world, its associates, and those with whom it came in contact might forget the stain upon its birth, that time and association might bury in oblivion and forgetfulness the ostracizing fact of illegitimacy, and that the child, indeed, the father of this man, might go forth into the world and be known and seen as other men are. This it was believed would not be accomplished did it remain under the care, keeping, and custody of its mother, were she ever so good a mother.

Counsel contend, however, that the purpose of the statute is legitimation, and prominently among the things to be accomplished is to secure to the child its father's name, right to support, and right of inheritance, and that its permanent residence in the home of its father is not necessary; that this could be accomplished by the open acknowledgment by the father of the child; by its temporary reception in his household, with his wife's consent, should he have one, and being treated while there, during such temporary time, as he would treat a legitimate child, and that thereafter the child would be legitimated for all purposes; that this would take from it the disabilities of bastardy, would entitle it to the support of its father, its father's name, and the right of inheritance. If these were the only purposes to be accomplished by this statute, it was entirely superfluous, and wholly unnecessary to enact it, for, by article 3, c. 59, Wilson's Rev. & Ann. St. 1903, there is a complete provision whereby an illegitimate child is made a charge upon its father, and he is compelled to provide such sum or sums, in any manner the court shall direct, for its maintenance and education, and of course it could assume its father's name if it so chose. Again, it would be su-

perfluous in order to enable it to inherit, for by section 99, art. 4, c. 86 (section 6897) Wilson's Rev. & Ann. St. 1903, it is provided that an illegitimate child is made the heir of the person who, in writing signed in the presence of a competent witness, acknowledges himself to be the father of such child, but in the first instance it is still a bastard, and in the other illegitimate. Under the latter, while it may inherit from its father, it does not represent its father or mother in inheriting any part of the estate of his or her kindred, unless prior to its birth its parents shall have intermarried, and the father after such marriage acknowledges it as his child, or adopts it into his family, then only would such child become legitimate, with the rights and privileges of such. Why, then, is not the statute under discussion (section 36) a necessary and indeed a controlling statute when all the others relating to the same subject are considered together? Except for it, there was no way whereby the father of an illegitimate child, who had married a woman other than its mother, could perfect so completely its legitimation, and thereby endow it with all of the attributes of legitimacy.

Counsel further insists that under section 6, *supra,* the mother of an illegitimate, unmarried, minor child, being entitled to its custody, services, and earnings, could not be deprived of them by a compliance with the provisions of section 36, without her consent; that to allow this would be to violate the fundamental provisions of the social compact, and would deprive her of her property therein without due process of law. In support of this we are cited to several authorities, one only of which in our judgment reaches the question presented. This is the case of *Lawson v. Scott,* 1 Yerg. (Tenn.) 92, decided by the Supreme Court of the state of Tennessee in August, 1825. The case holds that:

"The reputed father of an illegitimate child, who has legitimated it by virtue of the Acts 1805, c. 2, is not, in consequence thereof, entitled to its custody. The county court has no

power to put such child in his custody, or to bind it out contrary to the wishes of the mother, unless the child is a pauper."

We have no access to the statute there construed, but from the recitals in the opinion it appears that Scott was the father of an illegitimate child, and that in the October term of the county court for 1824 he filed his petition, and prayed that the child might be legitimated and made his heir according to the provisions of Acts 1805, c. 2. The court made the order of affiliation, named the child after its reputed father, and recorded it his heir. It thereupon declared that the father, having legitimated the child, had a right to the custody of it, and made an order that "said Scott take, into his custody and keeping, the child, and that he exercise the rights and authority of lawful father to said child." On appeal the Supreme Court, speaking through Judge Catron, and construing the statute of 1805, held as indicated above. From the recital the act may have provided for the mere acknowledgment of the child in order to constitute him the heir of the father substantially as provided for in section 99, c. 86, *supra*, of the Statutes of Oklahoma, and this can be readily conceived to be the extent of its scope when the entire opinion is critically examined. The fact that the court holds that the father was not entitled to its custody, and then does not quote any portion of the statute which would bring this into question, is some evidence at least that the statute contained no provision for the placing of the custody of the child in its father. If, however, the statute construed was as broad as our statute (section 36) under discussion, then this case is an authority against the conclusion to which we have come. 5 Cyc. at page 637, says:

"The putative father of a bastard is entitled to its custody against all but the mother. On legitimation the child is subject to the custody and control of the father to the same extent as in the case of a legitimate child."

Under this text numerous authorities are cited, from some of which we have quoted, and the case of *Lawson v. Scott* is cited alone as being against the doctrine of the text.

A child is primarily a ward of the state. The sovereign has the inherent power to legislate for its welfare, and to place it with either parent at will, or take it from both parents and to place it elsewhere. This is true not only of illegitimate children, but is also true of ligitimate children. The rights of the parent in his child are just such rights as the law gives him; no more, no less. His duties toward his child are just such as the law places upon him.

In the case of *Bennett v. Bennett*, 13 N. J. Eq. 114, the Chancellor having under consideration the custody of two children, the father and mother of which were living apart, and having awarded the same under a statute to the mother, the father contending that his rights were invaded, the court said:

"It is argued that the statute is unconstitutional, being in violation of the vested rights of the husband. The statute does not impair the obligation of any contract, and is not unconstitutional on that ground. Nor is it suggested that there is any other clause of the Constitution with which it conflicts. But it is urged that it is in violation of the fundamental principles of government, an infringement of the rights of private property, for the protection of which government was instituted, and is therefore void. The argument proceeds on the assumption that the parent has the same right of property in the child that he has in his horse, or that the master has in his slave, and that the transfer of the custody of the child from the father to the mother is an invasion of the father's right of property. The father has no such right. He has no property whatever in his children. The law imposes upon him, for the good of society and for the welfare of the child, certain specified duties. By the laws of nature and of society he owes the child protection, maintenance, and education. In return for the discharge of those duties, and to aid in their performance, the law confers on the father a qualified right to the services of the child. But of what value, as a matter of property, are the services of a child under seven years of age? But, whatever may be their value, the domestic relations and the relative rights of parent and child are all under the control and regulation of the municipal laws. They may and must declare how far the rights and control of the parent shall extend

over the child, how they shall be exercised, and where they shall terminate. They have determined at what age the right of the parent to the services of the child shall cease, and what shall be an emancipation from his control."

To the same effect is the reasoning of the Supreme Court of Colorado in the case of *McKercher v. Green*, 13 Col. App. 270, 58 Pac. 406:

"The old rigid rule of the common law, which gave to the father, by reason of the paternal relation, under all circumstances, except in very extreme cases, the right to the custody and services of his child, superior to that of the mother and of all others, has in modern times been greatly modified and relaxed both in England and America. Now it is almost universally conceded in both countries that this paternal right must yield and be subordinated to the interest and welfare of the child, under the control of the state. As was said by an English judge: 'The child, as soon as born, is entitled to the protection of British law for his person and property, equally with any other of her majesty's subjects. It is his birthright, and it is only that there may be best secured to him the assistance and protection of law, and that he may acquire that education or training which will enable him afterwards to discharge the duty which he owes as well to his country as to himself, that he is placed by law under guardianship during the early years of his life.' In *Mercein v. People*, 25 Wend. (N. Y.) 99, 35 Am. Dec. 653, it was said: 'There is no parental authority independent of the supreme power of the state. But the former is derived altogether from the latter. The moment a child is born it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated, by its duty of protection, to consult the welfare, comfort, and interest of such child, in regulating its custody during the period of its minority.' The American rule is thus tersely summed up by an American text-writer on the subject: 'It may be considered as the settled doctrine in American courts that all power and authority over infants are a mere delegated function, intrusted by the sovereign state to the individual parent or guardian, revocable by the state through its tribunals, and to be at all times exercised in subordination to the paramount and overruling direction of the state.' Hoch. Inf. p. 16."

So the sovereignty which had the power to say that the mother of an illegitimate. unmarried minor child is entitled to its custody; services and earnings had an equal power. to place a limitation upon such right; and in this case one of such limitations is contained in the section under which the father acted. But the rights of such father are not absolute; they in their turn are limited by other sections of the statute, among which may be mentioned section 9, art. 1, c. 59 (section 3768) Wilson's Rev. & Ann. St. 1903, which provides:

"The abuse of parental authority is the subject of judicial cognizance in a civil action in the district court brought by the child, or by its relatives within the third degree, or by the officers of the poor where the child resides; and when the abuse is established, the child may be freed from the dominion of the parent, and the duty of support and education enforced."

From all of which may be seen, growing stronger with the years, a tender solicitude for the welfare of the child. The child in this case is innocent of any of the wayward acts of its parents, and it is their highest and most imperative duty toward it to see to it that it does not suffer therefrom. That they may not be able to shield it entirely is possible, but they compound their sin to the extent that they can and do not. The beautiful prose poem by the learned Justice Irwin who tried this case, found in his judgment regarding a mother and her affectionate regard and love for her child, deserves a better place in literature than to be buried in the musty files of a court record. We do not dissent, but heartily concur with him where he says, in part:

"No man, I care not what his surroundings may have been, or what age or condition of life he may have reached, if he has a remnant of memory left, he can go back in his own existence, and remember the loving care and tender affection and purifying influence of a mother's love. I care not how mean a man may be, or how low down he may have gone in the scale of human degradation, there always remains a lingering regard for the influence of childhood, and a respect for the love of his mother. There is a certain something, planted by the hand of Nature itself, in the heart of the mother that prompts her to do for her own child that

Allison *et al.* v. Bryan.

which no other person on earth would or could do.   There is no way known to the human mind, no method known by which you can sound the length, breadth, and depth of a mother's love.   No way by which it can be estimated, gauged, or measured.   And this feeling is not confined to, or prevalent in, any particular station in life, or any particular condition of society.   It does not abide alone in the palace of the wealthy, the humble cottage of the poor, or in the hovel of the destitute, but runs through, and is ever present, in all grades and conditions in human life.   It is as universal as human reason, and as deep as the springs of human life.   Its duration is coextensive with human existence.   If I were to select a single earthly virtue as of greater value than all others, select the sweetest, fairest flower that ever bloomd in the human heart and shed its fragrance over the human pathway, I would select that which marks the pure, unselfish love of a mother, and place it above all others as the purest, brightest, and best."

The sublime and touching sentiment contained in the foregoing tribute finds a response in the heart and breast of all who read it, and if this were a question to be determined by the measure of which, the father or the mother, loved most deeply, or which of them would be willing  and glad to do most  for this child,  we would unhesitatingly yield, as did the learned judge, to the mother, but this is not a question as between the love of the father or the mother, nor between them and their offspring, but primarily between this child and the world which it must confront and face in making its way along life's highway.   We believe that the evidence introduced in this case shows that the mother is living and leading a  respectable,  honest,  industrious,  upright  life.   We believe that these respondents have a good home, surrounded by proper influences, and that either of these parties is qualified, as far as ability is concerned, to give to this child the nurture and care its necessities demand.   But all must see that this boy growing into manhood at his mother's side would be subject to the adverse conditions which are mentioned in the different standard works on domestic relations, and in the cases we have cited, and that these conditions would be a blighting handicap to him, for which his mother's love will constitute no antidote.   While on the

other hand, if his care and custody, maintenance and education, are given to his father, and he goes into his father's home and his father's family, he will, or should, there be surrounded by conditions which will relieve him entirely of this stigma, and give him a standing and a place in society and the world. Literature contains no panegyrics to the patient, plodding, hard-working, duty-bound father, and we will not indulge in any here, but no boy who has grown to manhood's estate, and had a good, honest, honorable, upright father to direct his course, can fail to recognize and know what a valuable asset to him that father's good name was; what a shield that father's family became. The father's friends were his friends; the father's business relations readily became his; and he grew and throve because of the character that had been established before him by his father. His presence was a constant encouragement, his example an ever present model, and a boy, circumstanced as this one is, by becoming a member of his father's household will meet more nearly on an equality with others the problems of life than did he remain with his mother.

We would not have it understood, however, that in thus declaring the law we hold he should not see his mother, be with her, or be permitted to enjoy her society, nor she his. Not at all. Under the judgment rendered in this cause in the lower court provision was made for the father to visit the child, and the successfull respondents should not be deaf to those common promptings of humanity which dictate that the child and the mother be granted the utmost possible latitude for social communion consistent with the new duties placed upon all. In case of sickness or accident the mother should be promptly notified, and, if she desires, permitted to attend, care for, and nurse. The treatment to be accorded the child is that usually accorded legitimate children. Such children are frequently permitted to go from home to visit their friends and kindred, and friends and kindred are frequently permitted to visit them, and this is the treatment that the father, in this instance and in this case, should accord to this child, and which should now establish its relationship toward its mother.

The judgment of the lower court is accordingly reversed, and the case is remanded to the district court of Cleveland county with instructions to set aside the judgment heretofore rendered herein, and enter one in accordance with this opinion. The costs incurred in this litigation are hereby taxed against Kenner Whittaker Allison, Sr.

Hayes, Kane, and Turner, JJ., concur; Williams, C. J., dissents.