TEMPLEMAN v. BRUNER *et al.*

No. 3322.   Opinion Filed January 19, 1914.

(138 Pac. 152.)

On Rehearing April 17, 1914.

(139 Pac. 993.)

1.   **INDIANS—Property—Legitimation—Heirship.**   An illegitimate, mixed-blood Creek citizen having been legitimatized under section 4399, Rev. Laws 1910, by the father without the consent of the mother, and having died November 4, 1908, without issue, unmarried, intestate, and being survived by his father and mother, who had not intermarried, held, that the mother inherited his allotment under section 8421, Rev. Laws 1910, and that the father inherited no part thereof.

2.    **BASTARDS—Legitimation—Effect on Mother's Rights.** While the effect of legitimatizing a child under section 4399, Rev. Laws 1910, is to establish reciprocal rights and duties between the father and the child, the same as those existing between legitimate parents and their legitimate children, yet, where the rights of the mother are involved, the child is still an illegitimate.

(Syllabus by Galbraith, C.)

*Error from District Court, Hughes County;*
*John Caruthers, Judge.*

Action by Walter E. Templeman against Janetta Bruner and another. Judgment for defendants, and plaintiff brings error. Affirmed. On rehearing. Petition denied.

*Jas. R. Rogers* and *Warren & Miller,* for plaintiff in error.

*Crump & Skinner,* for defendants in error.

*Hatchett & Ferguson, Wm. Tyree,* and *G. A. Hawley, amici curiae.*

Opinion by GALBRAITH, C.  The one question presented by this appeal is whether the father or the mother inherited the allotment of Edmond Sewell, enrolled as a mixed-blood Creek citizen, and who was born out of wedlock, and whose father and mother never intermarried, but who was legitimatized in the manner provided by section 4931 of Comp. Laws 1909, being section 4399, Rev. Laws 1910.  The action was tried upon an agreed statement of facts, from which it appears that Edmond Sewell was enrolled as a mixed-blood Creek Indian, and that he received an allotment of land by reason thereof, and that the land in controversy is a part of such allotment; that Washington Sewell was the father of Edmond Sewell, and Janetta Bruner was his mother; that he was born out of wedlock, and his parents never intermarried; that Edmond Sewell died in Hughes county, Okla., on the 4th of November, 1908, without issue, intestate, and unmarried, and was survived by his father, Washington Sewell, and his mother, Janetta Bruner; that he was eighteen years of age at the time of his death, and that when two years old his father, Washington Sewell, publicly acknowledged him as his own child, and received him, with the consent of his

wife, Sophia Sewell, into his family, and treated him as a legitimate child, and he continued to live with his father until his death; that on the 5th day of October, 1910, Washington Sewell executed and delivered a deed to the land in controversy to the plaintiff, Walter E. Templeman; that on the 24th day of December, 1910, Janetta Bruner executed and delivered a warranty deed conveying an undivided one-half interest in the land in controversy to J. W. Chestnut. The court found that the father, Washington Sewell, legitimatized Edmond Sewell, as provided in the statute, and that at the time of his death Edmond Sewell was the legitimate child of Washington Sewell, within the meaning of said statute, and that upon the death of Edmond Sewell his mother, Janetta Bruner, inherited his allotment, and that Washington Sewell, the father, did not inherit any part thereof, and decreed accordingly.

It is earnestly contended by the plaintiff in error that the trial court erred in construing the statute, and in denying the right of the father to inherit. The statute reads as follows:

"The father of an illegitimate child, by publicly acknowledging it as his own, and receiving it as such, with the consent of his wife if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this article do not apply to such an adoption." (Section 4399, Rev. Laws 1910.)

At common law a bastard had few rights and few obligations. He was without name, except as he might acquire one by reputation. He was without parentage or kith or kin, and was denied inheritable blood. He was truly an outcast and a vagabond. The rights and privileges he now enjoys under the law are derived from statutes. His status at common law was as follows:

"I proceed next to the rights and incapacities which appertain to a bastard. The rights are very few, being only such as he can *acquire;* for he can *inherit* nothing, being looked upon as the son of nobody; and sometimes called *filius nullius,* sometimes *filius populi.* Yet he may gain a surname by reputation, though he has none by inheritance. All other children have their primary

settlement in their father's parish; but a bastard in the parish where born, for he hath no father. * * * The incapacity of a bastard consists principally in this: That he cannot be heir to any one, neither can he have heirs, but of his own body; for being *nullius filius,* he is therefore of kin to nobody, and has no ancestors from whom any inheritable blood can be derived. * * * And really any other distinction but that of inheriting, which civil policy renders necessary, would, with regard to the innocent offspring of his parents' crime, be odious, unjust, and cruel to the last degree; and yet the civil law, so boasted of for its equitable decisions, made bastards, in some cases, incapable even of gift from their parents. A bastard may, lastly, be made legitimate, and capable of inheriting, by the transcendent power of an act of Parliament, and not otherwise, as was done in the case of John of Gant's bastard children, by a statute of Richard the Second." (1 Blackstone, p. 459.)

It seems that section 4399, *supra,* was adopted by the Legislature of Oklahoma Territory from Dakota, and that section 8421, Rev. Laws 1910, was adopted at the same time and from the same source. This latter statute reads as follows:

"If an illegitimate child, who has not been acknowledged or adopted by his father, dies intestate, without lawful issue, his estate goes to his mother, or, in case of her decease, to her heirs at law."

Section 4399 has been before the Supreme Court of Oklahoma for consideration in at least two cases. In one the question was as to the effect of legitimation under the statute upon the right to the care, custody, and control of the bastard as between the father and mother, the court holding that the right was with the father. *Allison et al. v. Bryan,* 21 Okla. 557, 97 Pac. 282, 18 L. R. A. (N. S.) 931, 17 Ann. Cas. 468.

In the other case the controversy was between the same parties, but the main question for decision was as to the effect of the legitimation under the statute upon the status of the child. The father, after having legitimatized the child, commenced a statutory proceeding in the court to legally adopt it without the consent of the mother, contending that he, as its father, had the right to consent to the adoption, and that the consent of the mother was not necessary. The court held that he was wrong in his contentions, and that the effect of legitimatizing the child

under the statute did not deprive the mother of the right to consent or object, and in discussing this question in part said:

"But no case has been called to our attention, and a most diligent search has failed to reveal one, which has gone to the extent of holding that the father after having, against the mother's wishes and will, legitimated the child could then further ignore the mother's affection and interest in it, and again act against her consent and effect an adoption with all its legal consequences. It is true that, acting under the statute, the father has completely legitimated the child; it now enjoys all of the rights and privileges of a legitimate child as mentioned in the case of *Pratt et al. v. Pratt et al.* [5 Mo. App. 539], *supra,* and 'the father of a legitimate unmarried minor child is entitled to its custody, services, and earnings' (section 4899, Comp. Laws 1909) and the reciprocal rights and duties between the father and the child are the same as those existing between legitimate parents and their legitimate children; *still, as to its mother, when her rights are involved, it is an illegitimate child,* and the law is that an illegitimate minor child cannot be adopted without the mother's consent, and that which cannot be done directly cannot be done indirectly. Except for the legitimating statute, no one could have disturbed this woman's complete right of custody in and to her child, and in our judgment it would be a strained and unnatural construction of this statute and the rights of the parties under it to yield to the contention of counsel for defendant, for 'the law should never receive such a construction as would tend to dry up the sources of natural affection.' *Barela v. Roberts,* 34 Tex. 554. If the mother desires to give her consent to adoption, she of course may do so, but she cannot be lawfully stripped of her inherent right to say No." (*Allison v. Bryan,* 26 Okla. 520, at 529, 530, 109 Pac. 934, 938 [30 L. R. A. (N. S.) 146, 138 Am. St. Rep. 988, Ann. Cas. 1912A, 1283]).

It will be observed that the court here held that the status of the child as to the reciprocal rights and duties between it and the father was the same as a child born in lawful wedlock, but that where the rights of the mother were involved the child was still illegitimate and a bastard.

It seems that these decisions settle the case at bar and support the holding of the trial court, since, if the act of the father in legitimatizing the child under the statute did not affect its status as an illegitimate where the rights of the mother were involved, then it necessarily follows that the estate of Edmond

Sewell on his death, unmarried, without issue, and intestate, was cast to his mother under section 8421, *supra*. The construction placed upon this legitimating statute by this court in the above case appeals to our sense of justice, and is conclusive of the question on this appeal.

We, therefore, recommend that the judgment appealed from be affirmed.

By the Court: It is so ordered.

## ON REHEARING.

Opinion by GALBRAITH, C. It is insisted that the court was in error in the conclusion announced in the original opinion filed herein. On account of the earnestness, zeal, and diligence of counsel in presenting their contention, we have again gone over this case carefully.

It is urged that since the Supreme Court of California, in *Blythe v. Ayres,* 96 Cal. 532, 31 Pac. 915, 19 L. R. A. 40, held that the effect of adoption or legitimation effected under section 230 of the Code of that state, which is identical with section 4399, Rev. Laws 1910, was to make the illegitimate child an heir of the father, and this holding simply followed the earlier case of *In re Jessup,* 81 Cal. 408, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594, and also since it was held by the same court in *Re Jobson,* 164 Cal. 312, 128 Pac. 938, 43 L. R. A. (N. S.) 1062, that the effect of legal adoption under the statute was to create the reciprocal relation of parent and child between the adopted child and the adopted father, and also since the state of South Dakota has a similar statute to that under consideration, and the Supreme Court of that state held in *Calhoun v. Bryant,* 28 S. D. 266, 133 N. W. 266, that the effect of legal adoption under the statute was to create the reciprocal relationship between the parent and the adopted child, the same as that existing between a natural-born child and its natural parent—therefore, the conclusion is urged, that, since this relationship establishes in the child the right to inherit from the father, it necessarily carries with it the reciprocal right of the father to inherit from the legit-

matized child. We cannot agree with this conclusion. The Supreme Court of South Dakota in *Calhoun v. Bryant,* as well as the Supreme Court of California in *Re Jobson,* was dealing with different questions from those presented in this case. In each of those cases the adoption of the child had been effected by regular probate proceedings, and the adopted child was not an illegitimate child, but a stranger in blood to the adopted father.

The diligent research of counsel has failed to call to our attention a single case exactly in point sustaining their contention. Their argument overlooks the pertinent fact, pointed out by the Supreme Court of South Dakota in *Calhoun v. Bryant, supra,* that the devolution of property is not a natural right growing out of the relation of parent and child, but is a matter governed entirely by statute. The court said:

"The right of inheritance does not grow out of the relationship of parent and child, though it may be created and conferred in the exercise of legislative wisdom, because of the existence of that relationship. But the right of inheritance is not a necessary incident of the relationship, whether natural or adopted."

It was said by Judge Coffey, who presided in the trial of the Blythe case:

"The whole question of devolution of property rights depends upon statutory enactments, and there is no natural right in the premises. Plaintiff claims, primarily, under section 230, Civil Code, which requires the institution of heir or adoption to be made by the father. It must be *the father.* The institution of heir is the primary object of the statute. The succession of property rights is incidental; it is a status that is involved; it is the relation of the child to society." (4 Coffey, Probate Dec. 139.)

The Supreme Court of California said in this Blythe case on appeal, quoting from Barr on International Law:

"Legitimation of bastards, either by subsequent marriage or by an act of the government (*rescriptum principis*), is nothing but a legal equalization of certain children illegitimately begotten with legitimate children. In other words, the object and effect of section 230 is to change the status and capacity of an illegitimate child to the status and capacity of a child born in lawful wedlock." (96 Cal. 560, 31 Pac. 916, 19 L. R. A. 40.)

We take it that these authorities sustain the conclusion announced in the original opinion filed herein, namely, that the effect of the legitimation of Edmond Sewell was to change his status from a bastard to a legitimate child, so far as society and his father were concerned, but did not affect his status as between himself and his mother. It is true that in *Allison v. Bryan*, 26 Okla. 520, 109 Pac. 934, 30 L. R. A. (N. S.) 146, 138 Am. St. Rep. 988, the primary question before the court for decision was the status of Edmond Sewell after he had been legitimatized under the provision of section 4399, Rev. Laws 1910, so far as it affected the right of the mother to visit him. In the decision of this question was necessarily involved the status of Edmond Sewell as between him and his mother, when the rights of the latter were involved, and the court held that as between him and his mother he was still a bastard notwithstanding his legitimation. If he was a bastard, his father did not inherit from him as against the claim of his mother.

We are constrained to adhere to the former holding in this case, and therefore recommend that the petition for rehearing be denied.

By the Court: It is so ordered.