446 So.2d 512 (1984)
STATE of Louisiana In the Interest of the Minor Senedra Madrell BARTEE.
No. CA-1244.
Court of Appeal of Louisiana, Fourth Circuit.
February 13, 1984.
Rehearing Denied March 21, 1984.
Writ Denied May 11, 1984.
Lee W. Rand, Max Zelden, Zelden & Zelden, New Orleans, for plaintiff/appellant.
*513 Roger R. Roy, New Orleans, for defendant/appellee.
Before LOBRANO, BYRNES and WILLIAMS, JJ.
LOBRANO, Judge.
The sole issue in this appeal is whether or not La.R.S. 9:403 allows an individual, (other than a State agency or officer of the Court) to institute proceedings to have a child declared legally abandoned. The facts of this case are as follows:
On or about February 9, 1983, Mrs. Mabel Barley (maternal grandmother of the minor child) executed and filed into the record of the Orleans Parish Juvenile Court an affidavit of abandonment alleging that George Bartee, father of the minor child, Senedra Madrill Bartee, had not seen, contributed to the support of or in any way exercised parental rights with respect to that minor child since on or before January 11, 1976. In her affidavit Mrs. Barley alleged that the minor had resided with her since February 12, 1975. She sought an order declaring her to be legally abandoned by her father George Bartee. The child's mother died in November of 1982.
On the day of trial, June 20, 1983, respondent appellee, George Bartee filed a Motion to Dismiss alleging that the abandonment proceeding was not instituted in accordance with La.R.S. 9:403(B) in that the proceedings were not brought by the State. The trial judge granted the motion without a hearing declaring that Mrs. Barley in her capacity as a private person was without standing to bring the abandonment proceeding. This appeal followed.
Appellant contends that despite the wording of La.R.S. 9:403(B)[1], the juvenile court was in error for not following this Court's holding in State in the Interest of Banks, 392 So.2d 497 (La.App. 4th Cir. 1980). Banks held that an individual could institute abandonment proceedings pursuant to La.R.S. 9:403, and that the plenary authority of the Court permitted a finding that the child was in fact abandoned. Prior to the Banks decision, this Court traditionally held that private persons could not bring abandonment proceedings. In the Interest of Jackson, 312 So.2d 912 (La.App. 4th Cir.1975); In Re State in Interest of Fischbein, 194 So.2d 388 (La.App. 4th Cir. 1967); In Re Meir's Adoption, 169 So.2d 583 (La.App. 4th Cir.1964). Our brethren of the First Circuit also follow the pre-Banks approach in interpreting La.R.S. 9:403. Wheat v. Street, 428 So.2d 930 (La. App. 1st Cir.1983); In the Matter of Harrell, 413 So.2d 1346 (La.App. 1st Cir.1982);
*514 In Re Allain, 407 So.2d 767 (La.App. 1st Cir.1981).
Although we can fully understand the equities of allowing a private individual to institute abandonment proceedings, especially under factual situations such as those set forth in Banks, supra, we still cannot ignore the plain language of La.R.S. 9:403(B). The abandonment statute is replete with language which clearly shows that the legislature intended that all such procedures be brought by and handled through the State. It sets forth the procedures to be taken by the department when a parent cannot be located, and it instructs the department to report its findings to the Court, and allows for necessary delays for good cause. See footnote 1, supra.
Clearly the legislature is the proper body to correct the abandonment statute and not the Court. We do feel that under certain circumstances a private individual should be allowed to institute abandonment proceedings, however we cannot authorize such actions. We interpret, not legislate.
Accordingly, we affirm the judgment of the trial court, and in so doing we reverse[2] the holding of State in the Interest of Banks, supra.
AFFIRMED.
GARRISON, Judge dissenting.
I respectfully dissent from the majority opinion in the following particulars:

I. The Holding of Banks

The majority opinion states as follows:
"Banks held that an individual could institute abandonment proceedings pursuant to La.R.S. 9:403 ..."
This is not the holding of Banks. This court reaffirmed the judiciary's prior interpretation when it stated "LSA-R.S. 9:403B authorizes an abandonment action to be initiated by an agency or officer of the court." (At. 498). We also note that the original judgment dated April 30, 1979 in the Banks matter contained the following language:
"PRESENT:
Beryl E. Wolfson, attorney on behalf of the State of Louisiana and Mr. and Mrs. Donald Trotter ..." (emphasis added).
The question of "who must file suit" or "who has the legal capacity to bring suit" under R.S. 9:403 was never an issue in Banks. No motions challenging the Trotters as necessary parties were ever filed. No motion challenging a failure to join an indispensible party, the State, was ever filed because the State was in fact a party. In short, the "holding" reputed to Banks was never even an issue in Banks.

II. The Difference Between Jackson and Banks

In Banks at the trial level, the trial court judge was seeking from this court a distinction between a Banks factual situation and a Jackson factual situation. In Jackson, cited above, at page 913, paragraph 2 the court even stated that:
"The principal issue in this court is whether the evidence established that Jackson `refused to provide for the care and support of the child for a period of at least four months under circumstances showing an intention to permanently avoid all parental responsibilities' R.S. 9:403." (emphasis added)
The facts in Jackson were totally different, involving a legitimate child, a prior divorce action, court-awarded custody, a dispute over child-support payment, and a sneaky attempt to cut-off the rights of a legitimate parent who had not in fact shown an intention to permanently avoid parental responsibilities, all made through an improper procedure by a strict and blinded interpretation of the four month rule under R.S. 9:403:
"Jackson and Mrs. Gossett were divorced in Georgia in August, 1967, with custody being awarded to the mother, who moved to Louisiana. The child visited Jackson *515 several times thereafter, but on two occasions a dispute developed over the child's return and Mrs. Gossett resorted to legal process. Mrs. Gossett refused to allow further visitation in Georgia.
* * * * * *
"As to the issue of failure to provide for care and support. Jackson had been ordered by the divorce judgment to pay weekly child support in the amount of $32.50. Alleging he had not complied with this order, Mrs. Gossett instituted a proceeding under R.S. 13:1641, the Uniform Reciprocal Enforcement of Support Law, and obtained judgment in September, 1970, which again ordered Jackson to pay support in this amount. He thereafter made seven weekly payments in five checks, the last one dated December 24, 1970.
Allegedly on the advice of his attorney not to make further payments while he was being denied visitation privileges, Jackson discontinued support completely. When Mrs. Gossett reactivated the U.R. E.S.L. suit, however, Jackson paid $780.00 on March 3, 1972, tendering this payment upon exacting Mrs. Gossett's agreement to forego prosecution of the non-support charged.
Jackson further testified that he sent two $20.00 checks in April, 1972 and one $60.00 check in May to the Clerk of Court, as ordered by the Georgia court; that these were returned to him in August; that upon advice, he then sent a check, dated July 23, in the amount of $160.00 to the Welfare Department in Baton Rouge; and that when this check was returned, his attorney advised him to simply wait and `sooner or later you'll hear from it, they'll have you in court.' The uncashed checks were introduced as supportive evidence, along with the clerk's envelope of transmittal.
Arguments in this court focused on the factual dispute as to support payments between March and October, 1972. The trial judge in extensive reasons for judgment expressed suspicion as to whether Jackson actually mailed the July, 1972 check to the Welfare Department and concluded that Jackson `maintained his previous course of conduct of never paying child support until and unless court proceedings were brought against him.' The judge observed that a truly concerned parent would have provided necessary support directly when it became apparent the Georgia clerk was not processing his checks.
* * * * * *
In the present case Jackson several times allowed four months to pass without providing support for the child. These circumstances indicated his intent not to support the child unless he was forced to do so (or, as he suggests, unless he was provided visitation rights). Non-support is not synonymous with abandonment, but is only evidence tending to establish abandonment. The circumstances of this case did not clearly manifest Jackson's intention to permanently avoid all parental responsibility." (emphasis added) (At 913-914).
As shown above, Jackson involved a child-support/visitation dispute between divorced parents. The abandonment proceeding developed as a result of the father's refusal to pay child support, when his ex-wife denied him visitation privileges. The quotation cited by the trial judge in the Banks case came from a paragraph in which the Jackson court was attempting to distinguish a pure abandonment proceeding from a support/visitation dispute:
"Furthermore, Jackson's behavior did not create a situation such as the abandonment action was designed to cover. The action to declare a child abandoned is a legislatively ordained procedure in which the state, without parental consent, can summarily place a child with an agency, defined in R.S. 9:401(1), when the child has been deserted or abandoned by his parent or parents. The procedure was not designed to afford a method for one parent to terminate the parental rights of the others; rather, the objective was to allow the juvenile court to place an abandoned child with an agency or *516 designated person in the child's best interest. While a child who has been judicially declared abandoned can thereafter be placed for adoption by the agency in an agency adoption proceeding, the action to declare a child abandoned was not intended as a first step in a private adoption proceeding or as a method of dispensing with parental consent in such a proceeding.
The abandonment proceeding has perhaps been used to circumvent the consent requirement for adoption. See Pugh, Juvenile Law of Louisiana History and Development, Ch. Ill, p. 276 (1957). However, the legislature in 1958 adopted R.S. 9:422.1 as a means in certain adoption cases of dispensing with the consent of a parent who culpably fails to support his child. Indeed, Jackson may have already forfeited his right to contest a stepfather's adoption suit by failing for one year to support the child in the mother's custody. However, that question is properly raised in an action for adoption.

The action before us is one by the state to declare the child abandoned, and proof of intent to forever avoid all parental responsibility is a necessary element of this action." (Emphasis added) (At 914-915).
The quotation referred to by the trial judge in Banks arose in a zealous discussion of the difference between a pure abandonment action and the Jackson situation in the Jackson opinion. Indeed, the language complained of was merely persuasive because the court had already determined that Jackson had no intent to permanently avoid his parental responsibilities. In its footnote 3, the court in Jackson further noted that Mrs. Gossett's potential remedy could be found elsewhere:
"3. If the custodial parent needs child support, the U.R.E.S.A. action is available. If the stepparent desires to adopt the child, the action for adoption is available."
The court in Jackson then went on to state that the abandonment action under R.S. 9:403 was not available to Mrs. Gossett in this divorce/custody/support dispute situation. We agree with Jackson on its facts.
Thus Jackson was correct on its facts. In Banks, the trial judge lifted the language verbatim out of the Jackson opinion, without perceiving it in the context of the facts in Jackson, and then applied it to a totally different and opposite factual situation (in Banks, a factually "pure abandonment action"). It was our contention in Banks that Jackson simply did not apply!
Banks did not involve a divorce/child support/visitation dispute.[1]Banks was clearly a "pure abandonment action." The natural mother not only had failed to provide any support or to show any interest in the child, she had ordered Donald Trotter to take the boy or she would give him away to "the first person on the street." She showed absolutely no interest in the child's welfare for over four years and did not provide one dime of support (in contrast to Jackson) even though she was gainfully employed. In short, under all the statutory and juridical elements of abandonment, the child Theodore was clearly "abandoned."
The trial judge found that under all legal criteria Theodore was clearly "abandoned." Then the fatal problem arose, however, when the Trotter's were asked by the biological mother's attorney if Theodore were later available for adoption, would they like to adopt him. The Trotters, of course, *517 answered yes. At that point, the trial judge lifted the language of Jackson and concluded that even though Banks was a pure abandonment action, and even though Theodore Banks was truly an abandoned child under the proper legal criteria, and even though the law clearly required that Theodore Banks be declared an "abandoned" child, he could not make that adjudication because of the constraining language of Jackson as applied to his knowledge that if Theodore were available to be adopted, the Trotters would like to adopt him. Was it the intention of now Justice Lemmon, the writer in Jackson, to provide that where there is a legitimate abandonment action, the trial court cannot adjudge a child to be abandoned in the face of all law, solely because "somewhere out there in the world" there is somebody who would like to adopt the child, if available? I think that Justice Lemmon never intended the language of Jackson to result in such an interpretation and that the trial judge was clearly wrong in that interpretation.
What did the language in Jackson mean?
"While a child who has been judicially declared abandoned can thereafter be placed for adoption by the agency in an agency adoption proceeding, the action to declare a child abandoned was not intended as a first step in a private adoption proceeding or as a method of dispensing with parental consent in such a proceeding." (At 914).
It meant that the trial court cannot "put the cart before the horse"where he has knowledge that the child may be adopted, he cannot disregard the facts and legal criteria of "abandonment" and summarily declare the child "abandoned" solely for the purpose of paving the way for an adoption proceeding. Likewise, however, the language in Jackson also meant that where there is an abandonment action in which the facts and the legal criteria clearly point to a finding that the child is abandoned, the trial court is not precluded from issuing such a finding solely because someone somewhere may want to adopt the child sometime.
In Banks, this court was further concerned that if the trial judge's misinterpretation of the Jackson language were allowed to stand, an evidentiary problem would be created. In most abandonment actions there is someone, be it a relative, neighbor, or authorized foster parent, who has been caring for the child. Opposing counsel would need only call the provisional caregiver to the stand and ask "If available, would you like to adopt the child sometime?" in order to totally defeat an abandonment action[2] under the trial judge's misinterpretation above. As a practical matter, a child could never be judicially declared abandoned.
Does Jackson mean that an abandonment action can never lie in a factual context wherein a divorce happens to be found? Of course not.
Jackson is correct on its facts and Banks is correct on its facts. Accordingly, it is a violation of the concept of judicial restraint to overrule Banks.

III. Later Caselaw
The majority opinion cites several later cases: In Re Allain, 407 So.2d 767 (La. App.1st, 1981), plus Matter of Harrell, 413 So.2d 1346 (La.App.1st, 1982) and Wheat v. Street, 428 So.2d 930 (La.App.1st, 1983), both citing the Allain decision.[3]
In the Allain case, a particularly zealous attorney first cited the Banks case for the erroneous "holding" that was discussed in Section I. It is the job of a good attorney *518 to win his case and, in the zealous pursuit of the fine art of advocacy, attorneys will occasionally "cross the line" by citing cases for propositions for which they do not stand, argue "headnotes" instead of case text, and interpolate factors from very different cases in order to appear to have a holding favorable to their case. The writer agrees with the holding in Allain and reiterates that Banks never stood for that proposition.

IV. Senedra Madrill Bartee
Turning to the case of Senedra Madrill Bartee, we note the following facts. Shelia Marie Barley Bartee and George Bartee were married. On September 8, 1973, Senedra, a legitimate child who was issue of the marriage, was born in Houston, Texas. Some five years later, on June 5, 1978, Shelia and George were divorced by judgment of the Civil District Court, Parish of Orleans. Shelia Bartee was awarded custody and no child support payments were ordered. In November of 1982, Shelia Bartee died.
Because Shelia Bartee's job was in Houston, her parents, Mr. Clarence and Mrs. Mabel Barley have cared for the child since February 12, 1975. Apparently, although George Bartee resides in Orleans Parish he has not seen the child since January 11, 1976.
On February 3, 1983, Mrs. Mabel Barley attempted to have the child declared "abandoned" by executing an affidavit. Unlike the Banks case, the State of Louisiana was not a party to this action. Also unlike the Banks case, the legitimate father filed a motion to dismiss which was granted below.
The maternal grandparents, however, are not precluded from obtaining custody. The Civil Code provides as follows:
C.C. Art. 157(A)
"In all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted to the parents in accordance with Article 146." (emphasis supplied).
C.C. Art. 146, however provides as follows:
"... custody shall be awarded in the following order of preference, according to the best interest of the children:
1. To both parent jointly ...
2. To either parent ...
3. If to neither parent, to the person or persons in whose home the child has been living in a wholesome and stable environment.

4. To any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment.

B. Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child. Allegations that parental custody would be detrimental to the child, other than a statement of that ultimate fact, shall not appear in the pleadings..." (emphasis added).
C.C. Article 146 further enumerates various elements of the "best interest of the child" test:
"(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

*519 (f) The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference..."
Additionally, the Code provides for other options as well:
C.C. Art. 81.
"If a father has disappeared, leaving minor children born during his marriage, the mother shall take care of them and shall exercise all the rights of her husband with respect to their education, and the administration of their estate."
C.C. Art. 84.
"There shall be appointed for the children a provisional tutor in the manner herein directed, if at the time of the disappearance of the father, the mother should be dead, or if she should die before their attaining the age of majority."
The majority holds that Mr. and Mrs. Barley chose an improper procedure and are in an incorrect forum. The law does, however, provide a potential future remedy in a properly brought and proven rule to change custody or tutorship action under the Articles cited above. Discussion on the question of whether the Barleys did however, choose an improper procedure and are in an incorrect form follows below.

V. Legislative Appeal
The last part of the majority opinion deals with an appeal to the legislature. We agree with the majority that if their interpretation of the statute is valid, then there is a need for reform. On the face of the statute as now written, however, the majority's interpretation cannot stand.

A. "May" v. "Shall"
The initial part of R.S. 9:403(B) reads:
"An affidavit may be made by an agency, or an officer of the court, ..."
If the majority's interpretation that only the State (through the agency or officer) can execute the affidavit is correct, then use of the permissive form "may" in the statute is an error. To preclude the execution of an affidavit by a private individual, the statute must read:
"An affidavit shall be made by an agency or an officer of the court, ..."
Thus on the clear language of the statute, I respectfully dissent that the statute does not preclude the execution of the affidavit by a private individual.

B. "An Affidavit"
It is elementary under both the civil and criminal law of this State that an affidavit must be based on personal knowledge or else it is not an affidavit, but rather some other procedural device.
The Code of Criminal Procedure specifies the three methods of instituting criminal prosecutions and the three types of procedural devices:
"A prosecution for an offense which may be punished by death shall be instituted by indictment by a grand jury. Other criminal prosecutions in a district court shall be instituted by indictment or by information. A prosecution for violation of an ordinance shall be instituted by affidavit. Other criminal prosecutions in a city court and prosecutions in a parish court shall be instituted by affidavit or information. Criminal prosecutions in a juvenile court or family court shall be instituted by affidavit, information, or indictment."
C.Cr.P. Art. 382 (emphasis supplied).
The Code of Criminal Procedure further defines the three devices. Both the indictment and the information must be authorized in the official capacity of the members of the criminal justice system returning them. In contrast, the affidavit form does not require that the person making the accusation be an authorized member of the internal criminal justice system:
"An indictment is a written accusation of crime made by a grand jury. It must be concurred in by not less than nine of the grand jurors, indorsed `a true bill,' and the indorsement must be *520 signed by the foreman. Indictments shall be returned into the district court in open court; but when an indictment has been returned for an offense which is within the trial jurisdiction of another court in the parish, the indictment may be transferred to that court."
C.Cr.P. Art. 383 (emphasis supplied).
"An information is a written accusation of crime made by the district attorney and signed by him. It must be filed in open court in a court having jurisdiction to try the offense, or in the office of the clerk thereof."
C.Cr.Proc. Art. 384 (emphasis supplied).
"An affidavit is a written accusation of crime made under oath and signed by the affiant. It must be filed in open court in a court having jurisdiction to try the offense, or in the office of the clerk thereof."
C.Cr.Proc. Art. 385 (emphasis supplied).
It is clear that under C.Cr.P. Art. 385, the affidavit provides for the institution of an action by a private individual. Judicial notice is further taken of the fact that in many municipal court cases, prosecution is initiated upon the affidavit of a private individual based upon that individuals personal knowledge of alleged criminal acts against him.
Additionally, Criminal Procedure Article 14 further preserves the distinction between an affidavit and other instruments:
"A. If a person refuses to take an oath OR to make a sworn statement OR affidavit required in connection with any criminal proceedings, he may affirm in lieu of swearing, and his affirmation shall fulfill the requirement and shall have the same legal effect as an oath, sworn statement, or affidavit.
B. Every witness shall be sworn or affirm to speak the truth and nothing but the truth."
Turning to the area of civil law, we note that C.C.P. Article 967 specifically provides that an affidavit be made on personal knowledge:
"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits.
"When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
If it appears from the affidavits of a party opposing the motion that for reasons stated he cannot present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
If it appears to the satisfaction of the court at any time that any of the affidavits presented pursuant to this article are presented in bad faith or solely for the purposes of delay, the court immediately shall order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees. Any offending party or attorney may be adjudged guilty of contempt."
The prior Article 967 also required personal knowledge, as does Federal Rule 56(e). Pacific Legal Foundation v. Watts, 539 F.Supp. 841 (D.C., Cal., 1982).
In order to defeat an affidavit not made on personal knowledge, the opponent utilizes *521 the procedural device of a motion to strike:
"The failure of the opposing affiants to affirmatively show that their statements were made on personal knowledge does not prevent judicial consideration of their affidavits. An affidavit which does not measure up to formal standard is subject to a motion to strike. In the absence of such a motion or other objection, the lack of showing of personal knowledge is waived, unless it is clear from the affidavit itself that it is not based on personal knowledge of the facts. Barnes v. Sun Oil Co., 362 So.2d 761, 763 (La.1978). See, Scharf v. U.S. Atty. Gen., 597 F.2d 1240 (9th Cir.1979); Lacey v. Mutual Fire Ins. Co. of Boston, 554 F.2d 1204 (1st Cir.1977); Assoc. Press v. Cook, 513 F.2d 1300 (10th Cir. 1975); 6 Moore's Federal Practice Section 56.22[1] (2d ed. 1980); Wright & Miller, Federal Practice and Procedure, Civil Section 2738 (1979). In the present case, the record discloses no objection or motion to strike, and it appears the facts could have been within affiants' personal knowledge."
Vermillion Corp. v. Vaughan, 397 So.2d 490, 493 (La., 1981). See also: Meyers v. Gulf Ins. Co., 413 So.2d 538 (La.App.4th, 1982); Joiner v. Weeks, 383 So.2d 101 (La. App.3rd, 1980); Childers v. Childers, 373 So.2d 1388 (La.App.1st, 1979); Bernard v. Vidrine, 365 So.2d 525 (La.App.3rd, 1978); Barnes v. Sun Oil Co., 362 So.2d 761 (La., 1978); Atkinson v. Allstate Ins. Co., 361 So.2d 32 (La.App.3rd, 1978); Bonomo v. Lake Forest, Inc., 346 So.2d 358 (La.App. 4th, 1976); McWhiney v. Travelers Ins. Co., 343 So.2d 736 (La.App.2d, 1976); Manuel v. Shaheen, 316 So.2d 878 (La.App.3rd, 1975); Moreaux v. American Mut. Ins. Co., 302 So.2d 686 (La.App.3rd, 1974); Duplessis v. Hullinghorst, 255 So.2d 236 (La. App.1st, 1971); Hidalgo v. General Fire & Cas. Co., 254 So.2d 493 (La.App.3rd, 1971).
In Atkinson, cited above, our bretheran on the Third Circuit re-affirmed the holding of Hidalgo, above, that "... `personal knowledge' means something which the witness actually saw or heard, as distinguished from something he learned from some other person or source." (At 496) (emphasis supplied).
In McWhitney, above, the court refused to accept the affidavit of the parish coroner based on his autopsy and attesting to the cause of death because the coroner had "no personal knowledge concerning the facts surrounding decedent's employment, or conditions or hazards to which decedent might have been exposed, nor does he have any personal knowledge concerning the facts or circumstances surrounding decedent immediately prior to and at the time of his death." At 738.
Returning to the statute at issue, I note that it reads:
"An affidavit may be made by an agency or an officer of the court ..."
As we have just seen, affidavits are based on personal knowledge, C.Cr.Proc. Art. 385, defining affidavits, provides for the institution by a private individual, and C.Cr.Proc. Art. 382 provides for institution in juvenile court "by affidavit, information, or indictment." It thus follows that if the Legislature had wanted to provide that only the State could institute the proceeding, it would have used the words "indictment or bill of information" instead of "affidavit." On the clear face of the statute, the legislature meant for a private individual to be able to execute an affidavit to initiate proceedings. This interpretation is especially valid in light of the Legislature's choice of the word "may". Clearly the Legislature meant for an agency's initiation to be in addition to private individual initiation.

C. "Agency or Officer of the Court"
The Civil Code provides that the following individuals are officers of the court: The Clerk, Deputy Clerks, the Minute Clerk, Sheriff, Constable or Marshall, Crier, Court Reporter, Court Appointed Expert and the Attorneys. C.C.P. Arts. 251-375. How often will any of these individuals have the requisite "personal knowledge"things which they "actually saw or *522 heard", as distinguished from something he learned from "some other person or source."? Atkinson, above. Likewise, when will the agency ever have the requisite "personal knowledge"? In short, they rarely will have such "personal knowledge" and it will be impossible to have a valid "affidavit."
Both the agency or officer generally must rely upon something "learned from some other person or source." Instead, of an affidavit reading "X's father told me that he was leaving and never coming back", the "affidavit" would have to read "Y told me that X's father said that ..." Such a writing would not be an affidavit at all, but rather it would only be ritualized hearsay.

D. The Intent of the Legislature in R.S. 9:403(B)
Having thus seen that the statute as written clearly provides on its face for the institution of proceedings by a private individual, does this mean that the State has no part in the abandonment proceeding? Clearly, not. R.S. 9:403(B) provides in its entirety:
"An affidavit may be made by an agency, or an officer of the court, before the judge or clerk of the juvenile court having jurisdiction over the child setting forth in general terms the facts constituting abandonment and the place or residence of the parent of the child if known to the deponent. The judge shall then by order fix a time and place for the hearing of this matter not less than sixty days after the date of the order. If the parent of the child resides within the state, notice of the hearing shall be served upon the parent as in civil proceedings, at least thirty days prior to the date fixed for hearing which and if the residence of the parent be out of the state, notice of the hearing shall be sent by the clerk of court to the parent by registered mail, if his address be shown in the affidavit, at least thirty days prior to the hearing. If the parent resides out of the state or cannot be served in the state within ten days after the issuance of process, the court shall appoint an attorney at law as curator ad hoc and legal representative of the parent, and notice of the hearing shall be served upon the curator ad hoc. The curator ad hoc shall make a diligent effort to locate the parent. In the event that the curator ad hoc shall fail to locate the parent within twenty days to notify him of the pendency of the proceedings, he shall report his failure to the court whereupon the court shall then direct the department by mail or otherwise to make a diligent effort to locate the parent and inform him of the pendency of the proceedings. The department shall report its findings in writing to the court on or before the date fixed by the court which shall not be less than twenty days from service of notice. The department may ask for a further delay which may be granted for good cause. Proceedings insofar as the parent are concerned shall be had contradictorily with the curator ad hoc and be of full force and legal effect against the parent. The date for the hearing may be continued from time to time by the judge for good cause, upon such notice to parties as he may determine."
Thus it appears to this writer that while the statute allows for a private individual as affiant, it also contemplates serious State involvement through the Department[4] such that the State must be joined as an indispensible party in such a case, and must provide the court with an investigative report as is now done. This I believe to be the true Legislative intention.
I have no desire to make abandonment proceedings "the gateway to adoption" or unleash a floodgate of litigation. Neither, however, do I desire to do violence to the clear language of R.S. 9:403(B).
NOTES
[1] La.R.S. 9:403(B) provides:

"B. An affidavit may be made by an agency, or an officer of the court, before the judge or clerk of the juvenile court having jurisdiction over the child setting forth in general terms the facts constituting abandonment and the place or residence of the parent of the child if known to the deponent. The judge shall then by order fix a time and place for the hearing of this matter not less than sixty days after the date of the order. If the parent of the child resides within the state, notice of the hearing shall be served upon the parent as in civil proceedings, at least thirty days prior to the date fixed for hearing which and if the residence of the parent be out of state, notice of the hearing shall be sent by the clerk of court to the parent by registered mail, if his address be shown in the affidavit, at least thirty days prior to the hearing. If the parent resides out of the state or cannot be served in the state within ten days after the issuance of process, the court shall appoint an attorney at law as curator ad hoc and legal representative of the parent, and notice of the hearing shall be served upon the curator ad hoc. The curator ad hoc shall make a diligent effort to locate the parent. In the event that the curator ad hoc shall fail to locate the parent within twenty days to notify him of the pendency of the proceedings, he shall report his failure to the court whereupon the court shall then direct the department by mail or otherwise to make a diligent effort to locate the parent and inform him of the pendency of the proceedings. The department shall report its findings in writing to the court on or before the date fixed by the court which shall not be less than twenty days from service of notice. The department may ask for a further delay which may be granted for good cause. Proceedings insofar as the parent are concerned shall be had contradictorily with the curator ad hoc and be of full force and legal effect against the parent. The date of the hearing may be continued from time to time by the judge for good cause, upon such notice to parties as he may determine.
[2] In compliance with this court's internal rule the question of overruling Banks has been submitted to the entire court, a majority of which join in the overruling, with GULOTTA, SCHOTT, GARRISON and CIACCIO, JJ., dissenting.

GARRISON, J., assigns reasons.
[1] Joyce Banks, the biological mother who was additionally a minor at the time of birth, and Donald Trotter, the biological father, never married. At the time of conception and at the time of birth, Donald Trotter was married to another woman and they had other issue of the marriage. Under the state of the law as it existed at the time Banks was heard, Theodore was thus an adulterous bastard and as such it was legally impossible for him to be acknowledged or legitimated as to his biological father. C.C. Art. 202. Mr. Trotter was thus legally "as a stranger" to his son. Of course, under the law, Mrs. Trotter was in the same position as a "stranger" to Theodore. The distinctions between legitimate and illegitimate children have since been abolished under our law, but they were in effect at the time of Banks. Neither of the Trotters were "parents" in the legal sense of the word, but were more in the nature of "foster custodians."
[2] This, of course, assumes that the provisional caregiver would, as is the way with human nature, become attached to the child and that the caregiver would not lie on the stand. I think that it is counterproductive to the judicial process to place the caregiver/witness in such an untenable position that the only way in which an unreasonable dismissal in a totally proper abandonment case could be avoided is by perjury. A system which encourages perjury in order to avoid an unreasonable result will inevitably result in a total loss of the credibility of the judiciary and the judicial process, as has been the experience with the exclusionary rule.
[3] At the time of writing there are no reported cases citing Matter of Harrell or Wheat v. Street.
[4] R.S. 9:401(2) provides "`Department' means the Louisiana Department of Health and Human Resources."