**Dean Ann DAVIS, Appellee,**

v.

**Billy Joe DAVIS, Appellant.**

No. 58468.

Supreme Court of Oklahoma.

Oct. 22, 1985.

As Corrected Oct. 25, 1985.

**4.** See footnote 1 *supra*.

James E. Briscoe, Luther, for appellant.

Dan A. Erwin, Messrs. Erwin, Butts & Lenora, Chandler, for appellee.

OPALA, Justice.

The dispositive issue on certiorari is whether an involuntary termination of parental bond may be effected in a private interparental proceeding based upon the grounds provided in 10 O.S. 1981 § 1130(A)(4).[1] We answer this question in the negative and reverse the trial court's termination order.[2] The remedies provided in the so-called Juvenile Code[3] are to be viewed as restricted to public-law contests in which the state may rightly assert an interest *qua parens patriae*. In a purely

---

1. The terms of 10 O.S.1981 § 1130(A)(4) provide in pertinent part:

"A. The finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations: * * *

4. A finding that a parent who does not have custody of the child has willfully failed to contribute to the support of the child as provided in a decree of divorce or in some other court order during the preceding year or, in the absence of such order, consistent with the parent's means and earning capacity; * * *"

2. The dispositive issue—a public-law issue—was raised by none of the parties. Where public-law issues are involved, this court may, on review, consider them upon theories not presented below. *Special Indemnity Fund v. Reynolds*, 199 Okl. 570, 188 P.2d 841, 842 [1948] and *McCracken v. City of Lawton*, Okl., 648 P.2d 18, 21 [1982].

3. 10 O.S.1981 § 1101 et seq.

private interparental proceeding either to free a child of a parent's dominion or to effectuate the termination of parental bond, the plaintiff must resort to the remedies provided under either 10 O.S. 1981 § 9 [4] or § 60.6(3).[5]

The mother brought a proceeding to effect severance of the father's legal bond to his minor daughter. When the parties were divorced, custody of the minor daughter in contest was placed in the mother. The father, who was ordered to make monthly child support payments, was granted reasonable access by visitation. The mother remarried. She later obtained leave to take the child overseas by a modification order that provided for the father's custody over a three-week period each year during the mother's return visit to the United States.

The mother failed to comply with the decree. During her subsequent stay in the United States she declined to yield complete custody for the court-ordered period. The father then ceased making support payments in September, 1980. In February, 1982, the mother sought to terminate his parental bond by invoking the grounds provided in 10 O.S. 1981 § 1130(A)(4). De-

spite the father's belated efforts to meet his delinquent support obligation, a termination order came to be rendered on March 31, 1982.[6]

The Court of Appeals reversed, holding that the trial judge mistakenly believed § 1130 left him without any choice in the matter of termination.[7]

I

THE PURPOSE OF THE JUVENILE CODE IS TO AUTHORIZE THE STATE'S INVOCATION OF SPECIAL JUDICIAL PROCESS WHEN CHILDREN ARE DEEMED DEPRIVED OR DELINQUENT

Legislative concern for neglected and delinquent children first manifested itself in 1905.[8] Laws dealing with state power to intervene through judicial process for adjudication of a child to be either delinquent or deprived are entirely of statutory origin. None of these legal norms existed at common law.[9] The statutes pertaining to delinquent, dependent, and neglected children are found in Chapter 51 of Title 10—the so-called Juvenile Code.[10] For administra-

---

4. 10 O.S.1981 § 9 provides:
"The abuse of parental authority is the subject of judicial cognizance in a civil action in the district court brought by the child, or by its relatives within the third degree, or by the officers of the poor where the child resides; and when the abuse is established, the child may be freed from the dominion of the parent, and the duty of support and education enforced."

5. The relevant terms of 10 O.S.1981 § 60.6 are:
"A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock without the consent of its mother, if living, *except* that consent is not necessary from a father or mother: * * *
3. Who, for a period of twelve (12) months next preceding the filing of a petition for adoption of a child, has willfully failed, refused, or neglected to contribute to the support of such child:
a. in substantial compliance with a support provision contained in a decree of divorce, ..." [Emphasis added.]

6. When he was served with the motion to terminate his parental rights, the father tendered into the court the sum of $2,200. The money was refused by the mother. At trial, she stated, "I

want his rights terminated, so I didn't accept the money."

7. When rendering his order, the trial judge stated:
"The statute appears to be a rather harsh remedy, but I don't see anything that shouldn't be followed. It's very clear that father or parent who fails to contribute to the support of the child for a period of over one year, or during the preceding year, has their [sic] rights terminated. So, I don't see that the Court has any choice under the statute but to terminate parental rights."

8. The Legislative Assembly of the Territory of Oklahoma created the Children's Aid Society and prescribed methods for protecting dependent, neglected, and ill-treated children within the territory. Okla.Sess.L. 1905, Ch. 14, p. 201.

9. *Ex parte Powell*, 6 Okl.Cr. 495, 120 P. 1022, 1027 [1912].

10. Through the enactment of the Juvenile Code, "... the law *extended* its power over young people—mostly lower class—who had been beyond the reach of prior law, and who had com-

tion of legal process under this new body of law, special courts—the so-called "juvenile courts"—were created in 1909.[11] Until 1968 county courts remained vested with jurisdiction over all cases falling within the terms of the Code.[12] After that, cognizance came to be reposed in the district courts.[13]

 Statutes dealing with the juvenile process allow the state, through its appropriate organs, to assume custody of deprived and delinquent children and to perform duties as surrogate parents.[14] This form of government intervention is based upon the principle of *parens patriae* (parent of the country).[15] The doctrine not only allows the legislature to enact laws affecting children, but also places on it the duty to do so. Every child, from the moment of its birth, owes allegiance to the government of his country and, conversely, is entitled to the protection of that government, both in his person as well as property.[16]

 Before the Code's enactment the state could not interfere by public action

with the parental management of a child, nor was it able to protect a child who stood accused of criminal misconduct from the application of adult criminal process. The Code was designed (1) to enable the state to intercede by judicial proceedings whenever public protection for an underage citizen was deemed needed[17] and (2) to authorize a special judicial process for underage persons charged with criminal misconduct.[18] In short, the entire Juvenile Code must be viewed as creating *public/state* remedies to be administered in the best interest of minors who fall within its contemplation.[19]

## II

## THE LEGISLATURE INTENDED THAT ONLY THE STATE MAY INITIATE AND PROSECUTE PROCEEDINGS AUTHORIZED BY THE CODE

The legislature has laid down a line of demarcation between the proceedings in conformity to the "juvenile process" and private actions, with the plain objective of

---

mitted no crimes." [Emphasis added and footnote omitted.] Lawrence M. Friedman, *A History of American Law*, at 520 [1973].

The so-called "dependent and neglected" category became the "deprived" class of children. 10 O.S.1981 § 1101(4).

**11.** Okla.Sess.L., 1909, Ch. 14, p. 185.

The first juvenile court act was passed in Illinois. Laws of Ill., 1899, p. 131. For an indepth study of the history and philosophy of juvenile courts, see Glueck, The Problem of Delinquency [1959]; Platt, The Child Savers—The Invention of Delinquency [1969] and Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.R. 985 [1975].

**12.** Okla.Sess.L.1909, Ch. 14 § 2, p. 186; 10 O.S. 1961 § 102; *Powell v. Lohah*, Okl., 436 P.2d 55 [1967]; *State ex rel. Cox v. Lohah*, Okl., 434 P.2d 928 [1967] and *In re Harris*, Okl., 434 P.2d 477 [1967].

**13.** Okla.Sess.L.1968, Ch. 282 § 102 and 10 O.S. 1981 § 1102(A).

**14.** 10 O.S.1981 § 1129; *Ex parte Parnell*, 19 Okl.Cr. 273, 200 P. 456, 458 [1921]; *State ex rel. Hunter v. Duncan*, Okl., 288 P.2d 388, 391 [1955] and *Carignan v. State*, Okl., 469 P.2d 656, 659 [1970].

The terms of § 1129 provide that Juvenile Code provisions "... shall be liberally construed, to the end that [their] purpose may be carried out, to wit: That the care and custody and discipline of the child shall approximate, as nearly as may be, *that which should be given by its parents* ...." [Emphasis added.]

**15.** *State ex rel. Hunter v. Duncan, supra* note 14. *See generally,* Rossman, Parens Patriae, 4 Ore. L.R. 233 [1925].

**16.** *Ex parte Powell, supra* note 9, 120 P. at 1028.

**17.** *Ex parte Parnell, supra* note 14.

**18.** See Friedman, *supra* note 10 and Perrin, The Future of the Children's Court, 8 A.B.A.J. 767 [1922].

**19.** *Kent v. United States*, 383 U.S. 541, 554, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 [1966] (The theory underlying juvenile-related statutes is to determine the needs of the child and of society); *Stratton v. Steele*, Okl., 519 P.2d 468, 471 [1974] (Actions under the Juvenile Code are in the nature of special proceedings instituted for the child's protection); *York v. Halley*, Okl., 534 P.2d 363 [1975]; *Matter of Meekins*, Okl.App., 554 P.2d 872, 874 [1976] and *Matter of J.L.*, Okl., 578 P.2d 349, 351 [1978].

conferring on the state *alone* standing to file a petition and to prosecute a proceeding under the provisions of the Juvenile Code.

■ The terms of 10 O.S.1981 § 1102(A) provide that "[u]pon the filing of a petition, the district court shall have jurisdiction of any child ... alleged [to be] deprived, who is found within the county; *and of the parent, guardian or legal custodian of said child....*" [Emphasis added.] Jurisdiction over a *non*-custodial parent is not deemed necessary for the state's pursuit of its interest in the child, although that cognizance would, of course, be essential in any private interparental contest. Section 1103(B)[20] directs that the petition be entitled "In the matter of _____, an alleged ... [deprived] child...." " Lawsuits involving private parties are typically captioned in the adversarial alignment, i.e., plaintiff v. defendant. The private-suit style is procedurally foreign to contests authorized under the Juvenile Code. Indeed, in proceedings under the Code no defensive pleadings are necessary.[21] Section 1104 of the Code requires that the summons be served *on the person who has actual custody of the child, and on the child*, if it is over twelve years of age. A summons *need not* be served upon a *non*-custodial parent.

Section 1102.1 presents another clear manifestation of legislative commitment to separating private-law from state-action issues in litigation which affects the rights and status of underage persons. Through that section the legislature directs that issues raised in interparental disputes, which are appropriate for resolution within the framework of the so-called juvenile-docket proceedings, must be isolated and transferred for litigation in the context of those proceedings.[22] In private-law disputes involving parental rights, state-action issues may be triggered when the evidence shows that a child is deprived, i.e., neglected or dependent. Status-related issues must then be detached from the interparental private-law claim and removed to the juvenile docket for disposition under the Code.

■ Finally, 10 O.S.Supp.1982 § 1109(C) expressly provides that "[t]he district attorney *shall* prepare and prosecute *any case or proceeding within the purview of Chapter 51 of this title.*" [Emphasis added.] This language mandates that *only* the public prosecutor has standing to bring cases under the terms of the Juvenile Code.[23]

---

**20.** 10 O.S.Supp.1982 § 1103(B).

**21.** 10 O.S.1981 § 1103.1(A) and *Matter of Christina T.,* Okl., 590 P.2d 189, 192 [1979].

The terms of § 1103.1(A) provide: "No pleading subsequent to the petition is required, and the filing of any motion or pleading shall not delay the holding of the adjudicatory hearing."

**22.** The terms of 10 O.S.Supp.1982 § 1102.1 provide:

"Where the evidence in an action for a divorce, for alimony without a divorce, for an annulment, for custody of a child or for the appointment of a guardian of the person of a child, or in subsequent proceedings in such actions, indicates that a child is deprived or in need of supervision, the court, after proper notice, shall transfer the issues in regard to the child to the juvenile docket of the court for preliminary inquiry and determination."

**23.** The term "shall" is a word of command or mandate, with a compulsory and peremptory meaning. It denotes exclusion of discretion and signifies an enforceable duty, especially when addressed to public officials. *State ex rel. Ogden v. Hunt,* Okl., 286 P.2d 1088, 1090 [1955] and *Oklahoma Alcoholic Beverage Control Board v. Moss,* Okl., 509 P.2d 666, 668 [1973].

Although earlier statutes provided that "any reputable person" (who knows of a child in his county that appears to be either neglected, dependent or delinquent) was authorized to file a petition, Okla.Sess.L.1909, Ch. 14, p. 187, 10 O.S.1961 § 105, by judicial construction the county attorney was required to be notified and placed in charge of prosecuting the case as *dominus litis, Ex parte Lewis,* 85 Okl.Cr. 322, 188 P.2d 367, 380 [1947]. Later statutes expressly limited a private individual's role in initiating proceedings by requiring in each case a preliminary judicial inquiry to determine whether forensic action is warranted. Only by leave of court was a private individual then permitted to file a petition. 10 O.S.Supp.1968 § 1103(a). Notwithstanding the terms of § 1103—dealing with the petition formalities—the district attorney was still charged with the duty of preparing and prosecuting all cases arising under the Juvenile Code. 10 O.S.Supp.1968 § 1109(c). Even-

The vast majority of jurisdictions clearly hold that, absent express statutory authorization, private individuals have no standing to initiate and prosecute proceedings authorized by statutes prescribing forensic process for juveniles, i.e., process which pertains to the child's deprived status, delinquency, or termination of parental bond.[24]

## III

THE TERMS OF 10 O.S.1981 § 1130 CONSTITUTE A STATE-ACTION STATUTE UNDER WHICH PROSECUTION OF A TERMINATION PROCEEDING IS AUTHORIZED ONLY WHEN THE PUBLIC CAN ASSERT OFFICIAL CONCERN IN ALTERING A CHILD'S STATUS VIS-A-VIS ITS PARENT OR PARENTS

▇▇▇ By its very inclusion in the Juvenile Code, § 1130 stands legislatively earmarked as a state-action provision. The state's interest becomes implicated upon a

finding of harm to the child—actual or potential—or of the custodial parent's unfitness.[25] Absent this finding, public policy clearly favors preservation, not destruction, of a subsisting parent-child relationship.[26]

The introductory phrase to § 1130 clearly provides that while state-action adjudication of a child's delinquency, or of its deprived or in-need-of-supervision status, will not operate as a severance of the parental bond, it could form a prerequisite for the ensuing termination.[27] Nay, the entire Code is intended to serve the public rights of the State.[28] It can hence be invocable only when the cluster of tripartite interests—those of the child, parent, and the state—comes to be implicated in the controversy that is being pressed.

▇▇▇ All contests instituted under the Code must first be judicially examined or "screened" for "intake" before they are allowed to proceed.[29] The court, sitting in

tually, the direct participatory role of private individuals was completely eliminated when the legislature amended § 1103 to provide that only "... the district attorney or the person who is authorized to make a preliminary inquiry to determine if further action is necessary ..." may file a petition. Okla.Sess.L.1977, Ch. 259 § 3; 10 O.S.Supp.1984 § 1103(B).

**24.** *E.g., McCall v. District Court, County of Montezuma,* 651 P.2d 392 [Colo.1982]; *In re Juvenile Appeal,* 188 Conn. 259, 449 A.2d 165 [1982]; *In Interest of J.S.,* 404 So.2d 1144 [Fla.App.1981]; *Department of Human Resources v. Ledbetter,* 153 Ga.App. 416, 265 S.E.2d 337 [1980]; *In Interest of Dively,* 79 Ill.App.3d 428, 34 Ill.Dec. 812, 398 N.E.2d 635 [1979]; *In the Interest of J.R. and S.R.,* 315 N.W.2d 750 [Iowa 1982]; *Smith v. Wilson,* 269 S.W.2d 255 [Ky.1954]; *State In Interest of Bartee,* 446 So.2d 512 [La. App.1984]; *In re Welfare of G.,* 268 N.W.2d 420 [Minn.1978]; *In re Interest of S.R.,* 217 Neb. 528, 352 N.W.2d 141 [1984]; *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 [1974]; *D.Y.F.S. v. D.T. and J.T.,* 171 N.J.Super. 520, 410 A.2d 79 [1979]; *Harris County Child Welfare Unit v. Caloudas,* 590 S.W.2d 596 [Tex.Civ.App.1979] and *In re Welfare of Coverdell,* 30 Wash.App. 677, 637 P.2d 991 [1982]. *But see, In re G.,* 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244 [1974] and *In re Adoption of Two Children,* 170 N.J.Super. 320, 406 A.2d 468 [1979]. *See generally,* Termination of Parental Rights—Standing, 21 A.L.R.4th 535.

**25.** *Matter of Sherol A.S.,* Okl., 581 P.2d 884, 888 [1978] and *Matter of Baby Girl Williams,* Okl., 602 P.2d 1036, 1040 [1979].

**26.** *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 [1982].

**27.** See the introductory phrase in § 1130(A), quoted in footnote 1, *supra.*

**28.** The legislative characterization of the Juvenile Code is found in the title of the act, 10 O.S.Supp.1968 § 1101 [Okla.Sess.L.1968, Ch. 282, p. 444]:
"An Act relating to children; defining terms; dealing with delinquent children, dependent and neglected children, and children in need of supervision; defining powers of District Courts; prescribing procedure in certain cases; dealing with care and custody of children and termination of parental rights; restricting questioning of children by law enforcement officers and providing for counsel; providing for petition, hearing and powers of court; providing for juvenile probationary services; establishing domestic relations bureau in counties with population of 100,000; providing for detention of certain children; providing for operation of children's institutions, and for parole and after-care services, and defining powers of Department of Public Welfare; ..."

**29.** *State v. Juvenile Division, Tulsa County District Court,* Okl.Cr., 560 P.2d 974, 975–976 [1977].

the administration of the so-called juvenile process, functions as the legally trained discretionary authority charged with the duty of balancing societal interests with those of the child.[30]

 A § 1130 termination may be sought by the state *only simultaneously with or after a prior adjudication* of a child's deprived status.[31] Moreover, termination is an issue which must be deferred until after the initial petition has been adjudicated.[32]

 The integrity of the family unit and preservation of the parent-child relationship command the highest protection in our society.[33] Intrusion upon the privacy and sanctity of that bond can be justified only upon demonstration of *a compelling state concern.*[34] Public interest lies in protecting the child from harm. Absent the element of harm, intervention by the state is impermissible. *Resort to state-action remedies by private individuals would result in gross distortion of the legal demarcation line that historically has separated purely private interspousal claims from the legislatively-sanctioned process governing state intrusion into the traditional pre-Code areas of family immunity.*[35]

**30.** *State v. Juvenile Division, Tulsa County District Court, supra* note 29. The judges must determine whether an informal "adjustment or diversion" is preferable to the institution of juvenile proceedings. Their exercise of discretion is vital in effectuating the purpose of the Juvenile Code.

**31.** 10 O.S.1981 § 1130(A)(5); *Price v. Price,* Okl., 573 P.2d 251, 254–255 [1978], (Doolin, J., concurring specially). *Price v. Price, supra* at 257, (Simms, J., specially concurring); *Matter of Christopher H.,* Okl., 577 P.2d 1292, 1293 [1978]; *Matter of J.F.C.,* Okl., 577 P.2d 1300, 1302 [1978] and *Matter of Lyni P.,* Okl., 626 P.2d 864, 866 [1981].

**32.** *Matter of J.L., supra* note 19.

**33.** The parental interest in the custody of a child rests on the common law. Although initially created for economic as well as moral reasons (Blackstone, Commentaries on The Laws of England, (Wendells' ed. 1859) ), the presumption that a child's best interests are served by remaining in the custody of its natural parents is predicated in contemporary jurisprudence on principles of respect for familial ties and natural affection. *In re Sweet,* Okl., 317 P.2d 231, 235 [1957]. The companionship, care, and management of one's child is a fundamental interest protected by both the United States and the Oklahoma Constitutions. *Matter of J.N.M., S.T.M. and W.J.M.,* Okl., 655 P.2d 1032, 1035 [1982]; *In re T.H.L.,* Okl., 636 P.2d 330, 335 [1981]; *Matter of Baby Girl Williams, supra* note 25 and *Matter of Sherol A.S., supra* note 25. Termination of a right so fundamental dictates an application of the full panoply of procedural safeguards. *Matter of Chad S.,* Okl., 580 P.2d 983, 985 [1978].

**34.** *Matter of Baby Girl Williams, supra* note 25; *Matter of Sherol, A.S., supra* note 25 and *Matter of J.N.M., S.T.M. and W.J.M., supra* note 33 at 1036.

**35.** The distinction between public and private law is well recognized in the Anglo-American legal system. Blackstone acknowledged the distinctness of these two bodies of law. Blackstone's Commentaries of The Laws of England, Vol. III, p. 1 [private wrongs], Vol. IV, p. 1 [public wrongs] (Wendell's ed. 1859). He defined a *private* wrong as an infringement or privation of the *private* or *civil* rights belonging to individuals, considered merely as individuals, and therefore termed civil injuries, while public wrongs were described as a breach and violation of public rights and duties affecting the entire community, considered as a community.

The public-law/private-law dichotomy, as it affects claims to custody of and rights to children came to be recognized in State ex rel. Hunter v. Duncan, *supra* note 14 at 391, where the court clearly noted that the legal norms applicable to actions under 10 O.S.1951 §§ 101 et seq. (now §§ 1101 et seq.) were not necessarily the same as those which govern in custody contests ancillary to divorce proceedings. The court differentiated between (1) disputes in which the state invokes its interest as *parens patriae* concerned with the welfare of society and, more particularly, with the welfare of the child, and (2) quests for vindication of personal rights between the parents as private parties-litigant. The former disputes emphasize the state-child relationship, while the latter stress the parent-child family status interaction.

The dichotomy was again acknowledged in *Bingham v. Bingham,* Okl., 366 P.2d 396, 397–398 [1961], where the court cited *Hunter* to support its holding that a private child support dispute was not so related to a delinquency proceeding as to bring the case within the well-recognized exception to the general rule of immunity from service of process which is extended to a nonresident witness who is in the state attending court hearings. The fact that the non-

Indeed, this court *has* distinguished between an adoption without consent under § 60.6—a private remedy—and a § 1130 termination proceeding—a state remedy. In the former, counsel for the child is not required; with respect to the latter, the court has concluded that in *all* state termination proceedings potential conflicts do exist between the interests of the children and those of the state and the parents; hence, independent counsel must be appointed to represent the children *whenever* tripartite concerns are pressed in the context of proceedings under § 1130. The court's jurisprudence, which mandates separate counsel, is based upon the *state's responsibility* to protect the interests of minors.[36] In sum, § 1130 does not confer on private litigants a license to enforce rights which belong *only* to the public.

## IV

### IN THE MATTER OF MULLINS HAS NO PRECEDENTIAL VALUE AS AUTHORITY FOR THE MOTHER'S CLAIM THAT IS BASED ON § 1130 GROUNDS

#### A

██ The mother relies upon In The Matter of Mullins[37] to support her position. Factually distinguishable from the case at bar,[38] *Mullins* also was decided in a different procedural posture. The mother there had brought an appeal from vacation of a decree in which the father's parental bond came to be severed. While she favored us with her brief-in-chief, the father submitted no answer brief. The court concluded that his failure to brief dispensed with a duty to search the record for a theory to sustain the trial court's judgment.

When the brief-in-chief is reasonably supportive of the allegations of error, and no answer brief is filed, a reversal may be effected without a reasoned opinion.[39] Since the outcome in *Mullins* was dictated largely by a breakdown in the adversarial posture, no precedential value may be ascribed to that pronouncement.[40]

---

resident father in *Bingham* appeared at the delinquency hearing at which he could have pressed for custody of his son did not make him an in-state "litigant" who would be amenable to service of process in the mother's private support action.

Most recently, *Matter of C.G.,* Okl., 637 P.2d 66 [1981], gives continued viability to the public-law/private-law dichotomy. There, the court, though acknowledging that varying standards of review were being employed in purely private-law litigation affecting parental rights (whether these be custody, paternity or adoption contests), adopted the clear-and-convincing standard for all § 1130 public-law status-termination contests. *C.G.* explicitly distinguished between the § 1130 parental bond severance and § 9 actions. Litigation under the former section was characterized as of vital interest to the state, and the statute was described as intended to serve *public* rights only.

**36.** *Matter of T.M.H.,* Okl., 613 P.2d 468, 471 [1980]; *Matter of Christopher W.,* Okl., 626 P.2d 1320, 1322 [1981]; *Price v. Price, supra* note 31 (Doolin, J., concurring specially) and *Price v. Price, supra* note 31 (Simms, J., specially concurring).

**37.** Okl., 606 P.2d 573 [1980].

**38.** In *Mullins, supra* note 37, the court held that an anterior adjudication of either delinquency or deprived status was not required as a founda-

tion for severing the parental bond under § 1130(A)(4). There, the mother brought an action to terminate the father's status vis-a-vis their minor child because of his failure to provide support. The court ordered the father to pay the total arrearage within thirty days or suffer termination of the parental bond. The father failed to make the payment, and an order of termination followed. In the instant case, the father, upon receiving notice of the motion to terminate, tendered into the court the entire amount of past due support payments. He stated at the termination hearing that he did not want his rights severed, and that he was prepared to make further support payments.

**39.** *Matter of Lehman,* Okl., 591 P.2d 700, 703 [1979].

**40.** An exception to stare decisis, which withholds binding force from an appellate court decision that was *not* developed from adversary argument, is recognized by modern English jurisprudence. Cross, Precedent in English Law, 136, 140–146 [1961]. Oklahoma and federal authorities appear in accord with the English rule. See, e.g., *United States v. Tucker Truck Lines, Inc.,* 344 U.S. 33, 73 S.Ct. 67, 69, 97 L.Ed. 54 [1952]; *Miami Tribe of Oklahoma v. United States,* 281 F.2d 202, 208 [U.S.Ct. of Claims 1960] and *Lee v. Hester,* Okl., 642 P.2d 243, 245–246 [1982].

## B

■ The common law regards a parent's bond with the child as indestructible and hence not terminable by judicial decree.[41] Section 1130, which provides grounds for terminating parental rights, is a statute in derogation of the common law. Statutes that abrogate the common law are to be liberally construed—but only within the parameters of the legislative objective.[42] Liberal construction is not a device for extending the ambit of an enactment beyond its intended scope. Rather, the goal of that construction is to achieve interpretation which harmonizes and coincides with the lawmakers' objective.[43] Valuable common-law rights—like those of the parents—cannot be destroyed by statutes whose text does not, either explicitly or implicitly, address itself to interparental contests.[44]

Section 1130 contains no language indicating that it is applicable to private litigation. When the court in *Mullins*—without construing the terms of § 1130—permitted a private individual to invoke the grounds provided in that statute, it conferred upon a custodial parent a previously nonexistent power to secure, by decree, the destruction of a noncustodial parent's status. Continued application of § 1130 grounds to private litigation would effect an implied abrogation of the noncustodial parent's valuable common-law right to the integrity of the parental status.

Except as altered by our constitution and statutes, the common law remains in full force.[45] The intent to change it is never presumed from an ambiguous, inconclusive, or unclear text.[46] Alteration of the common law must be clearly and plainly expressed.[47] The legislature is *presumed to have no intent to extinguish common-law rights.*[48] Moreover, public law must not be interpreted as being destructive of private rights by mere inference.[49] Because § 1130 sets out termination grounds invocable only in a state-initiated proceeding, *Mullins* constitutes an aberrational norm, and, insofar as it may be interpreted to authorize a § 1130 termination in the context of a private interparental contest, it is overruled.

**41.** See *Allison v. Bryan*, 26 Okl. 520, 109 P. 934, 938–939 [1910]; *Bishop v. Benear*, 132 Okl. 116, 270 P. 569 [1928]; *In re Talley's Estate*, 188 Okl. 338, 109 P.2d 495, 498 [1941]; *Alford v. Thomas*, Okl., 316 P.2d 188, 192 [1957]; *J.V. v. State, Dept. of Institutions, etc.*, Okl., 572 P.2d 1283, 1284 [1978]; *In re Jackson*, 55 Nev. 174, 28 P.2d 125, 127 [1934] and *Nevelos v. Railston*, 65 N.M. 250, 335 P.2d 573, 576 [1959].

**42.** 25 O.S.1981 § 29; 12 O.S.1981 § 2; *Roxana Petroleum Co. v. Cope*, 132 Okl. 152, 269 P. 1084, 1086 [1928]; *In re Captain's Estate*, 191 Okl. 463, 130 P.2d 1002, 1004 [1942] and *Republic Bank & Trust Company of Tulsa v. Bohmar Minerals, Inc.*, Okl., 661 P.2d 521, 524–525 [1983].
The terms of § 29 provide: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to the laws of this state, which are to be liberally construed *with a view to effect their objects and to promote justice.*" [Emphasis added.]
The terms of § 2 are virtually identical to those of § 29.
Even the severance of a parental bond by adoption will not, absent explicit legislative language, operate to destroy the common-law right of a child to inherit from its natural parent. *Stark v. Watson*, Okl., 359 P.2d 191, 194–195 [1961] and *In re Talley's Estate, supra* note 41.

**43.** *Republic Bank & Trust Company of Tulsa v. Bohmar Minerals, Inc., supra* note 42.

**44.** *Republic Bank & Trust Company of Tulsa v. Bohmar Minerals, Inc., supra* note 42.

**45.** 12 O.S.1981 § 2. Its relevant terms provide: "The common law, as modified by constitutional and statutory law, judicial decisions and the conditions and wants of the people, shall remain in force in aid of the general Statutes of Oklahoma; ..."

**46.** *Reaves v. Reaves*, 15 Okl. 240, 82 P. 490, 495 [1905]; *McCormack v. Oklahoma Pub. Co.*, Okl., 613 P.2d 737, 740 [1980] and *State Mutual Life Assurance Company of America v. Hampton*, Okl., 696 P.2d 1027, 1036 [1985] (Opala, J., concurring).

**47.** *State Mutual Life Assurance Company of America v. Hampton, supra* note 46.

**48.** *Reaves v. Reaves, supra* note 46.

**49.** *Ricks Exploration Company v. Oklahoma Water Resources Board*, Okl., 695 P.2d 498, 504 [1985]. See also the authorities cited in footnote 41 *supra*.

## V

### THE TERMS OF 10 O.S.1981 §§ 9 AND 60.6(3) PROVIDE PROPER REMEDIES IN PRIVATE INTERPARENTAL LITIGATION

Since the record here is devoid of any evidence of harm sufficient for invocation of governmental intervention, the mother's sole recourse to affect the father's status vis-a-vis his child lies either in a private action countenanced by § 9 or in an adoption without his consent under § 60.6(3).[50]

While, under the common law, courts were powerless to sever the natural bond between parent and child, they could in equity restrict the quantum of parental control.[51] The terms of § 9 are declaratory of the common-law norms. That section provides for a private civil action, upon a complaint of abuse of parental authority, with a view to freeing the child from the guilty parent's dominion.

 Section 60.6 provides for the termination of parental rights ancillary to a private adoption without parental consent.[52] In the context of § 60.6, termination is a substitutionary device which insures that the child losing a parent is not left parentless in the aftermath of an adoption-related termination. The replacement of the lost parent is effected *in the very same proceeding* that produces the severance of the old parental bond. Thus, the target of § 60.6 is clearly distinct from that of § 1130. The former aims at parental substitution through termination coupled with an adoption, while the latter authorizes the state to terminate parental rights *in order to set the child free for a future adoption.*[53] In short, the § 60.6 proceeding operates to *replace* a parent, while that under § 1130 is designed to *emancipate* the child from the offending parent's or parents' legal bond.

 The 1973 amendment[54] of 10 O.S.1971 § 60.6[55] presents another eloquent demonstration of the legislative resolve to maintain the traditional common-law boundary line between state-action and private-law remedies. By that amendment the legislature expressly provided that consent-free adoptions—permissible under § 60.6 vis-a-vis some offending parents—may be granted without an antecedent

**50.** Adoption without parental consent has long been available in Oklahoma. See R.L.1910 § 4388.

**51.** See *Allison v. Bryan,* 21 Okl. 557, 97 P. 282, 287 [1908] and *Roxana Petroleum Co. v. Cope, supra* note 42, 269 P. at 1086–1087.

**52.** The legal norms applicable to consentless adoptions are well established. *E.g., Wade v. Mantooth,* Okl., 417 P.2d 313 [1966]; *In re Adoption of Greer,* Okl., 463 P.2d 677 [1970]; *In re Adoption of Eddy,* Okl., 487 P.2d 1362 [1971]; *In re Adoption of Gregory,* Okl., 495 P.2d 1275 [1972]; *In the Matter of the Adoption of E.S.P. and C.L.P.,* Okl., 584 P.2d 209 [1978]; *Matter of Adoption of Goodson,* Okl.App., 585 P.2d 1130 [1978]; *Matter of Adoption of Darren Todd H.,* Okl., 615 P.2d 287 [1980]; *Matter of Adoption of C.M.G.,* Okl., 656 P.2d 262 [1982] and *Matter of Adoption of V.A.J.,* Okl., 660 P.2d 139 [1983].

**53.** 10 O.S.1981 § 1133 and *Matter of Baby Boy Fontaine,* Okl., 516 P.2d 1333, 1337 [1973].
The terms of § 1133(A) clearly indicate that terminating parental rights under § 1130—*without the imminent prospect of adoption*—defeats the purpose of the statute. They provide:

"After parental rights have been terminated, a court may award custody of the child to any qualified person or agency with authority to consent to the adoption of the child, or the court, in its discretion, may reserve the authority to consent to the adoption of the child; but a court cannot consent to or authorize any person or agency to consent to the adoption of a child unless the rights of the parents have been terminated in accordance with the provisions of this act."

**54.** Okla.Sess.L.1973, Ch. 69 § 1.

**55.** 10 O.S.1971 § 60.6 provided:
"A legitimate child cannot be adopted without consent of its parents, if living, nor an illegitimate child without the consent of its mother, if living, except that consent is not necessary from a father or mother deprived of civil rights or adjudged guilty of cruelty, and for either cause divorced, or adjudged to be an habitual drunkard, or who has been judicially deprived of the custody of the child by any court of competent jurisdiction on account of cruelty or neglect."

§ 1130 termination.[56] The effect of the amendment was recognized in *Wade v. Brown.*[57] In that case we held that termination of parental rights under § 1130 is not a prerequisite to a consentless adoption under § 60.6, and that § 1134 [58]—which provides that a proceeding to adopt may not be combined with a § 1130 termination suit—does not conflict with § 60.6 because each has a separate operative effect.[59] This legislative scheme shows that § 60.6 is intended to afford a private remedy for involuntary severance of parental bond *via* a nonconsensual adoption, while the design of § 1130 is to authorize termination by the state whenever the tripartite cluster of interests—those of the child, parents, and of the state—may become implicated.[60]

In conformity with the Juvenile Code's history and its purpose, we hold that § 1130 grounds are not invocable in a private suit by the custodial parent who seeks termination of parental rights of the noncustodial parent.

The opinion of the Court of Appeals is vacated,[61] and the trial court's termination

**56.** The present version of § 60.6, as amended, (Okla.Sess.L.1981, Ch. 107, § 1) provides in relevant part:

"A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock without the consent of its mother, if living, except that consent is not necessary from a father or mother;

\* \* \* \* \* \*

*and where any of the above conditions exist it shall not be necessary to terminate parental rights under Section 1130 of this title prior to the adoption of said child.* Provided that any decree of adoption heretofore entered by the court of appropriate jurisdiction within the State of Oklahoma wherein termination of parental rights, as prescribed in Section 1130 of this title, was not obtained shall not be invalid on the ground that such termination of parental rights was not obtained." [Emphasis added.]

**57.** Okl., 516 P.2d 526 [1973].

**58.** The terms of 10 O.S.Supp.1968 § 1134 provided:

"An action to adopt a child may not be combined with an action to terminate parental rights, and where the rights of a parent have been terminated, neither an interlocutory nor a final decree of adoption may be rendered until the decree terminating parental rights has become final."

Section 1134 was amended by Okla.Sess.L.1977, Ch. 259 § 20. Its present version, 10 O.S.1981 § 1134, provides:

"An action to adopt a child may not be combined with an action to terminate parental rights, and when the rights of a parent have been terminated, neither an interlocutory nor a final decree of adoption may be rendered until the decree terminating parental rights has become final, *but this section does not apply to a proceeding to adopt a child without the consent of a parent when the court has determined that consent is not legally required.*" [Emphasis added.]

**59.** In *Wade v. Brown, supra* note 57, a petition for adoption without parental consent under § 60.6 was filed in the district court. The proposed order, presented to the trial court, requested a hearing on the § 60.6 adoption *or* a termination of the parental rights under § 1130. The trial court refused to set the adoption for hearing without a prior § 1130 termination. The precise question presented to the court was whether a § 60.6 action may be combined with a § 1130 termination proceeding. We held that it may not and directed the trial court to hold the § 60.6 adoption hearing without proceeding under § 1130. *Wade v. Brown, supra* note 57 at 529.

**60.** The record reflects that at the hearing on the mother's motion to terminate the father's legal bond, the state's interest was not triggered. No evidence was adduced disclosing any harm suffered or to be suffered by the child. The father expressed the desire not to have his rights terminated, declaring that he still loved his daughter and wanted to see her. He stated that he had ceased making support payments because he was being denied access to the child. There was no evidence presented as to the necessity of these payments to feed, clothe or shelter the child, or that without the payments she would not be adequately cared for. The mother presented no other evidence of the father's misconduct. She questioned only his failure to make support payments. She refused to accept the $2,200 in back child support because she wanted to secure a judicial severance of the parental bond. It is clear from the record that the father made child support payments from the date of divorce in March, 1979 until September 1980, when he discontinued them in a retaliatory move against the mother's withholding of custody, not in an effort to abandon or neglect his child.

**61.** In addition to the reasons stated in today's opinion, the Court of Appeals' decision must be vacated because that court, in reaching its decision, relied on *Irby v. Irby*, Okl.App., 629 P.2d 813 [1981], to reverse the trial court's termination order. We expressly overruled *Irby* in

order is reversed without prejudice to the mother's post-remand institution of a § 9 suit or to her joining in a proceeding to terminate the paternal bond in an adoption to be effected without the father's consent pursuant to the authority of 10 O.S.1981 § 60.6(3).

SIMMS, C.J., and LAVENDER, HARGRAVE and SUMMERS, JJ., concur.

DOOLIN, V.C.J., HODGES, WILSON and KAUGER, JJ., dissent.

ALMA WILSON, Justice, dissenting.

The appellee, Dean Ann Davis, the mother of the child in this case, brought this action for termination of the appellant-father's parental rights subsequent to the appellant's complete failure to contribute to the support of Brandy Michelle Davis, as provided in the parties decree of divorce, from September 8, 1980 until March 2, 1982.[1] The record reveals that while appellant withheld his court decreed support from the child, appellant was earning between $9.00 and $10.00 per hour. The only explanation given by appellant for not supporting Brandy Michelle was, "I didn't get visitation rights, so I didn't feel it was right to pay; ..."[2] However, at no time did appellant file pleadings to enforce the visitation rights which he claimed had been violated. Moreover, he did not testify that he had even demanded or made arrangements to enforce the visitation and/or custody rights provided in the original order decreeing "reasonable visitation" and the court's subsequent modification order of December 5, 1979, which provided:

"That the Plaintiff should be entitled to remove the minor child of the parties, Brandy Michelle Davis, from the Continental United States *during such period*

*of time as the husband of the Plaintiff is stationed [in the United States Army] overseas;* that *during such period [as the husband of the Plaintiff is stationed overseas]* of time the Defendant shall be granted custody of Brandy Michelle Davis for a period of 3 weeks per year, *said time to be arranged during the period that Plaintiff returns to the United States each year;* and that during such 3 week period of custody, child support for ¾ of the month shall be waived."

During the period the appellee's military husband was stationed in the United States Army in Germany, the child was twice brought back to the United States. On these two occasions, appellant was granted, and apparently acquiesced in, visitation arrangements with Brandy Michelle (age one year in 1980; age two years in 1981) in the home of the appellant-father's own mother. These two occasions in 1980 and 1981 which occurred during the period appellee's husband was stationed overseas, however, do not form the basis of the current controversy. The subsequent order modifying the original decree did *not* extend beyond the period of time that the appellee's husband was stationed in Germany. *See order, quoted supra.* At the conclusion of her husband's military tour, appellee returned to the United States with Brandy Michelle on January 6, 1982, at which time the original decree providing for "reasonable visitation" was effective. Thereafter, appellee testified that the appellant-father was granted the opportunity for visitation with Brandy Michelle at the appellant-father's own parents' house on Saturday and Sunday when Brandy Michelle (then age 3) was there. Whether or not this constituted "reasonable visitation" is not now before us. Rather, this appeal concerns the appel-

---

*Hester v. Hester,* Okl., 663 P.2d 727 [1983], three months prior to the Court of Appeals' decision in this case.

**1.** Payment was only then made the day before the original setting for the hearing and after service of the petition for termination of parental rights.

**2.** The child's entitlement to child support is *not* contingent upon visitation. The duty to support one's minor child is a continuing obligation; child support payments may not be used as a weapon to force visitation and vice versa. Other legal remedies exist which can be pursued to enforce compliance with custodial or visitation order. *Hester v. Hester,* 663 P.2d 727, 728 (Okl. 1983).

lant-father's utter failure, for a period of seventeen months, to pay the support due the child as set forth by court order and the consequences therefor under 10 O.S. 1981 § 1130(A)(4), which states most clearly:

A. The finding that a child is delinquent in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but *a court may terminate the rights of a parent to the child in the following situations:*

4. A finding that a *parent* who does not have custody of the child has *wilfully failed to contribute to the support of the child as provided in a decree of divorce* or in some other court order *during the preceding year* or, in the absence of such order, consistent with the parents' means and earning capacity; ... [Emphasis mine.]

Only when a case is not governed by a statute is this Court free to work out its own solution. Yet, here, 10 O.S.1981 § 1130, *above*, exists and is of the greatest relevance. Under this section, our State Legislature has authorized termination of the parental rights of a parent who does not have custody of the child and wilfully fails to contribute to the support of the child as provided in a decree of divorce. Inasmuch as child support payments are for the benefit of the *child*, rather than for the benefit of the custodial parent, I cannot agree with the majority's rationale which holds to the idea that the entire Juvenile Code is intended to serve only the *public rights of the state*. While the state may proceed, under proper circumstances, on behalf of the public to enforce the remedies under the Act, still the main thrust of the Act establishes the parameters of *rights enforceable by, or on behalf of children,* and of the correlative obligations imposed upon parents. I find nothing in the Act which evinces an intent by the Legislature to relegate complete and total enforcement of the private support rights of children

*exclusively* to the state in all cases under all circumstances. Such a welfare state of affairs, to my view, remains irreconcilably antithetical to fundamental notions of free and open access to the courts. To this end, the minor child herein (through her custodial parent) seeks legislatively ordained remedial redress of the child's individual right to the support set forth in the original decree of divorce. The legal contest is not, in substance, between the child's parents; but is rather between the child and the non-supporting parent. As in tort actions, excepting legal disability of minority, the child could bring the action against the non-supporting parent in her individual capacity. The state in such instance is not a necessary party to the action. As the majority points out, state-action issues are triggered when evidence is adduced that a child is *deprived,* as defined by statute. No such finding was required nor made in this case.[3] Were such a finding required, a support order in favor of a child would never be amenable to remedial redress under § 1130 outside of deprived cases. I do not believe the Legislature intended a law without remedy, where as here, the child's custodial parent, whose own interests are not at issue, performed those duties the state could otherwise perform as a surrogate parent. State governmental intervention in family matters based upon the doctrine of *parens patriae* should not be invocable under all circumstances. The doctrine has been traditionally invoked only where the necessity of the situation warranted state-governmental intervention for the protection of a child, as for example in deprived child actions brought against abusive parents. In such cases, the interests of the alleged abusive parents are diametrically opposed to those of the helpless child; and the child is in need of a parental surrogate to advocate his or her interest. Accordingly, the state may, as surrogate parent, then intervene as advocate for the child. A surrogate parent is, however, unnecessary where the child's own custodial

---

**3.** *Mullins v. Mullins,* 606 P.2d 573 (Okl.1980), addressed and settled the precise issue present-

ed in this case and should now be followed.

parent's interest is not at issue with the interest of the child, whose right is sought to be redressed. It is only where the evidence in such actions indicates that a child is *deprived* or *in need of supervision,* that the issues become appropriate for transfer to the so-called juvenile docket, after proper notice. *See f.n. 20, majority opinion.* The conflict of interest between parent and child manifested in *deprived* and *in need of supervision* issues, then, requires state advocacy in the form of state appointed counsel. There are no conflict of interest issues in the present action to resolve against the parents. Absent the element of harm to the child, intervention by the state is impermissible. The majority concedes that the record here is devoid of any evidence of harm sufficient for invocation of governmental intervention. However, I cannot agree that recourse to § 1130(A)(4) is barred by reason thereof. As previously stated by this Court:

> "A child may be receiving excellent care from the custodial parent, while the noncustodial parent refuses to obey a court order to contribute to the child's support. It would be ludicrous and perhaps impossible to require a determination of deprivation or delinquency under these circumstances, and the irresponsible parent would not only be able to escape his responsibilities, but continue to enjoy the benefits of parenthood, including visitation, rights of inheritance and rights to the childrens' earnings. Such a result would not only be inequitable and unconscionable, it would violate the statute." [4]

Nor can I agree with an interpretation which renders the statutes contained in Title 10, entitled "Children", procedurally irreconcilable. Statutes addressing the same subject matter are to be construed in a manner which reconciles differing provisions and renders an intelligent effect to each statute. [5] The majority's construction virtually repeals § 1130(A)(4). Legislative

repeal, however, can never be presumed but must be accomplished expressly. [6] I believe this Court is bound to construe the statutes of Title 10, entitled "Children", in conjunction, one with the other, giving force and effect to each (as prior case law has done) and thereby facilitate the substantive legislative intent irrespective of judicially imposed procedural dichotomies.

In the present case, I do agree that reversal is appropriate since the trial court apparently thought it had no discretion and that termination was *mandated.* The trial court in pronouncing judgment stated:

> "The statute [10 O.S.1981, § 1130(A)(4)] appears to be a rather harsh remedy, but I don't see anything in the statute that shouldn't be followed. It's very clear that a father or parent who fails to contribute to the support of the child for a period of over one year, or during the preceding year, has their rights terminated. *So, I don't see that the Court has any choice under the statute but to terminate parental rights.*" [Emphasis added.]

The only evidence presented in support of termination was failure to pay support, which coupled with the trial court's observations in its judgment, indicates the decision was based on a misconstruction of the law. The word "may" in 10 O.S.1981 § 1130(A)(4), is permissive not mandatory. Thus, the wilful failure of a noncustodial parent to contribute to the support of his or her child for a year preceding judgment does not *ipso facto* operate to forfeit parental rights or require their termination. The statute rather vests the trial court with discretion to terminate upon consideration of all the circumstances; it does not mandate termination.

Additionally, the appellant-father in this case ultimately attempted to comply with the support order by tendering child support arrearage into court prior to the trial court's rendition of judgment. Unlike

---

**4.** *Id.*

**5.** *Eason Oil Company v. Corporation Commission,* 535 P.2d 283 (Okl.1975).

**6.** *Beavin v. State ex rel. Dept. of Public Safety,* 662 P.2d 299 (Okl.1983).

§ 60.6 which authorizes *adoption* without parental consent upon a showing of non-support for a year preceding the *filing of the adoption petition,* § 1130(A)(4) provides for termination of parental rights for wilful failure to contribute to the support of the child *during the preceding year.* Absent the qualifying language specifying the applicable period of non-support as being measured by the *filing of the petition,* the period may reasonably be calculated as ascertainable on the date the trial court renders its *final judgment.* An erring parent is thus accorded every reasonable opportunity to comply with the duty to support his or her minor child before termination of parental rights. Absent unexcusable compliance, as determined by the trial court under all the circumstances, an irresponsible parent's wilful refusal to support his or her minor child may result in termination of parental rights under § 1130(A)(4).

DOOLIN, V.C.J., and HODGES, and KAUGER, JJ., join in the views expressed herein.

KAUGER, J., with whom DOOLIN, V.C.J., HODGES and ALMA WILSON, JJ., join, dissenting.

## I

**THE STATED PURPOSE OF THE JUVENILE CODE IS TO INSURE ADEQUATE AND APPROPRIATE CARE FOR EVERY CHILD. THE PUBLIC LAW VERSUS PRIVATE LAW DISTINCTION DOES NOT BAR PRIVATE SUITS UNDER 10 O.S.Supp. 1983 § 1130(A)(2)**

I must dissent from the majority opinion because it attempts to establish an unreasonable tension between state and private law based on a strained construction of the statutes of the State of Oklahoma. The Juvenile Code was enacted to protect the best interest of the children of this state, to provide adequate and appropriate care,[1] and to shield them not only from lack of the necessities of life, but also from abuse of their bodies, mind, and psyche. To the extent that the state has an interest in its children-citizens, public law is involved. However, the majority, in a refusal to follow the precedent of *Mullins v. Mullins,* 606 P.2d 573 (Okla.1980), raises the spectre that the Code, 10 O.S.Supp.1983 § 1130(A)(2), is applicable only to state actions. The majority opinion spawns a public-private right dichotomy holding that § 1130 cannot be used by parents to terminate parental rights, and that 10 O.S.1981 § 60.6 provides the exclusive private parental remedy.

This will be news to the Legislature. There could be no stronger statement of legislative intent that all sections of Title 10 are to be construed cumulatively than its most recent amendments. Under the umbrella of House Bill, No. 1308, the Legislature combined, amended, and codified 10 O.S.1981 § 60.5, 60.6 and 10 O.S.1981 § 1131. The amendments provide that parental consent is not required under § 60.6 if parental rights have been terminated pursuant to § 1130 and 1131. The amendment to § 1131 provides that in a proceeding to terminate parental rights if parental consent is not required under 60.6, the parent is deemed to be without parental rights. Section E of 10 O.S.1981 § 1131, as amended, permits waiver of notice pursuant to the provisions of § 1131 *and* 60.6 of this title. By requiring notice to putative fathers of children born out of wedlock the

---

1. The purpose which is contained in 10 O.S. Supp.1984 § 1129 provides in pertinent part: "... 1. That the care and custody and discipline of the child shall approximate, as nearly as may be, that which should be given by its parents, and that as far as practicable, any delinquent child shall not be treated as a criminal.
2. That the public policy of this state is to assure adequate and appropriate care and

treatment for any child, to allow for the use of the least restrictive method of treatment consistent with the treatment needs of the child and, in the case of delinquents, the protection of the public, to provide orderly and reliable procedures for the placement of a child alleged to be a child in need of treatment and to protect the rights of any child placed out of his home pursuant to law."

Legislature recognized a possible constitutional problem, and moved to grant the fathers of children born out of wedlock the same procedural due process afforded to fathers of children born in wedlock.[2]

The Title of the Act, H.B. 1308 states:

*"AN ACT RELATING TO CHILDREN;* AMENDING 10 O.S.1981, SECTIONS 60.5, 60.6 and 1131; PROVIDING FOR THE PARENTAL RIGHTS OF CERTAIN PERSONS; MODIFYING THE LIST OF PERSONS WHO ARE REQUIRED TO CONSENT TO AN ADOPTION; MODIFYING LIST OF PERSONS FROM WHOM CONSENT TO ADOPT IS NOT REQUIRED; PROVIDING FOR TERMINATION OF PARENTAL RIGHTS OF CERTAIN PERSONS; REQUIRING CERTAIN PETITIONS UNDER CERTAIN CONDITIONS; REQUIRING NOTICE AND HEARING SPECIFYING PERSONS ELIGIBLE TO RECEIVE NOTICE; SPECIFYING CONTENTS OF NOTICE; PROVIDING FOR ORDERS OF THE COURT; PROVIDING FOR CERTAIN DUTIES OF COURT CLERKS; ESTABLISHING THE PATERNITY REGISTRY; PROVIDING FOR CERTAIN DUTIES OF THE DEPARTMENT OF HUMAN SERVICES; REQUIRING PUBLICATION AND DISTRIBUTION OF CERTAIN INFORMATION; REQUIRING CERTAIN REPORTS; PROVIDING FOR CONFIDENTIALITY; PROVIDING FOR CODIFICATION; AND PROVIDING AN EFFECTIVE DATE."

The Oklahoma Constitution requires the title of every act of the Legislature to embrace one clearly expressed subject. The purpose of this provision is to prevent joinder of diverse or unconnected subjects in the same act.[3] Legislation amending sections of general law must operate on the same matters which logically and legally could have been included originally.[4] These amendments imply merely a change of provisions of the Act on the same subject contained in the original sections.

Termination of parental rights did not exist at common law. Statutory involuntary termination proceedings are in derogation of the common law and must be construed liberally. The fact that statutes abrogating the common law are to be construed liberally and harmoniously within the bounds of legislative objectives is the cornerstone of the majority opinion. I agree with this principle. What I do not agree with is the majority's failure to recognize controlling precedent or patent legislative intent as expressed in the title of H.B. 1308, and as codified in previous enactments.[5]

The Act, at the time the father's parental rights were terminated, provided that a legitimate minor child could not be adopted without parental consent pursuant to 10 O.S.1981 § 60.6, unless the parent was a drunkard, had been judicially deprived of custody in a divorce proceeding, judicially

**2.** Evans, "Independent Adoptions; In Whose Best Interest?", 53 O.B.J. 1805, 1808 (1982).

**3.** See Okla. Const. art. 5 § 57:
"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in title thereof."

**4.** *State ex rel Okla. State Highway Comm'n v. Horn,* 187 Okla. 605, 105 P.2d 234, 238 (1940); *Murch Bros. Const. Co. v. Cupp,* 177 Okla. 102, 57 P.2d 852, 856 (Okla.1936).

**5.** Title 12 O.S.1981 § 2 provides:
"The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma; but the rule of the common law, that statutes in derogation thereof, shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object."

determined to have been cruel or neglectful of the child, or wilfully failed to contribute to the child's support.[6] If these exceptions existed, termination of parental rights under 10 O.S. Supp. 1983 § 1130 was unnecessary.[7] Thus, the converse must be implied, if a parent could not meet the exceptions under § 60.6 to seek adoption without consent then he/she must seek termination under § 1130. The basic requisites of termination without consent have been somewhat standardized by the 1985 amendments. Consent is not required if the parent's rights have been terminated by § 1130 and § 1131, or if the parent willfully failed to contribute to the support of the child, nor is consent required if a determination has been made that an unwed father's consent is unnecessary.

However, the majority asserts that § 1130 is an action which can be brought exclusively by the state because of a state-private law distinction. *In essence, the distillate of the majority opinion is that parental rights may not be terminated by private parties unless an adoption follows.* This is contra to fundamental constitutional law because it establishes an impermissible classification of children and parents, and violates both the Okla. Const. art. 5, § 59 and the equal protection clause of the Fourteenth Amendment.[8] A distinction is made between children born out of wedlock, children who do not have a parent to fill the shoes of the missing component of the traditional nuclear family, and those who have a substitute parent ready to shoulder the burden of motherhood/fatherhood. Unfortunately, the fabric of the nuclear family has become frayed, and single parent families in many instances are the rule, not the exception to the rule. Neither the constitution of the State of Oklahoma nor the United States Constitution tolerate governmental imposition of preference in patterns of family living.[9] Courts must be sensitive to the different norms which operate within our pluralistic society.

If we adopt the statutory application urged by the majority, the following scenario will occur. A parent who wilfully fails to pay child support for over a year may have his/her parental rights terminated under § 60.6 if there is an adoptive parent waiting in the wings. *But,* without adoption, the same parent, wilfully refusing to pay child support, may not have his/her parental rights terminated unless the district attorney brings the action under § 1130. This taints termination proceedings with at least the appearance of possible criminality; it subjects the district attorney's office to an enormous financial burden; and it requires hiring additional staff to process what basically are domestic matters. *At a time when the fat in government should be trimmed, this statutory construction is imprudent as well as unconstitutional.*

Apparently, the public-private law i.e. state-private dichotomy was first recognized in *Hunter v. Duncan,* 288 P.2d 388, (Okla.1955). However, in *Hunter,* the court used the distinction *solely* to explain

**6.** The exceptions are provided in pertinent part in 10 O.S.1981 § 60.6:

"A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock without the consent of its mother, if living, except that consent is not necessary from a father or mother:
1. Adjudged to be an habitual drunkard; or
2. Who has been judicially deprived of the custody of the child by any court of competent jurisdiction, including a court which has jurisdiction of a divorce action involving said parent, on account of cruelty to or neglect of the child; or
3. Who, for a period of twelve (12) months next preceding the filing of a petition for adoption of a child, has willfully failed, re- fused or neglected to contribute to the support of such child: ..."

**7.** See note 8, infra.

**8.** See *Wilson v. Foster,* 595 P.2d 1329, 1333 (Okla.1979)

"Both under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as well as under the provisions of Art. 5, § 59, Okl. Con., dichotomizing of parents which results from affording them different modes of trial at the adjudicatory stage of the deprived-status proceeding is impermissible...."

**9.** *Moore v. East Cleveland,* 431 U.S. 494, 508, 97 S.Ct. 1932, 1940, 52 L.Ed.2d 531 (1977).

the differences in emphasis required in dependent and neglected child adjudication proceedings where the state's interest is that of *parens patriae*, to that of custody proceedings after divorce, involving personal rights of the parents and the children. The result of the state/public v. private interest discussed in *Hunter* does not substantiate that § 1130(A)(2) can only be instituted by state action. The teaching of *Hunter* is that there is a shifting emphasis in each case based on whether the parent or the state brings the action.

The Juvenile Code was enacted to serve the public by protecting children regardless of the initiator of the action. One cannot conclude that because the Juvenile Code is a public act, as are most statutes, the actions under it can be instituted only by the state. At the time of this proceeding the public v. private distinction was important only in the context of the due process notice difference between state initiated proceedings and privately instituted proceedings. Moreover, the difference in notice requirements did not serve to bar the initiation of § 1130 by either the state or private parties—it merely related to the procedural requirements of bringing the action. Under the newly amended procedures, notice for both state and private initiated proceedings follow the same procedure insofar as notice to fathers of children born out of wedlock is concerned.

The issue regarding institution of suit is analogous to the decision in *Williams v. Williams*, No. 61,121 (not for publication)

and *Yarborough v. Yarborough,* 708 P.2d 1100 (Okla.1985) also decided today.[10] In *Yarborough,* this Court was concerned with the provision of 10 O.S.Supp.1982 § 1109(C) which purports to render exclusive authority to the District Attorney to prosecute actions under the Juvenile Code. Section 1109 [11] has also been amended to provide an attorney for a child or the parents if termination of parental rights is a possibility. The Legislature has elected to prohibit the district attorney from serving as counsel for the child. I disagree with the *Yarborough* rationale that the mother lacked standing to implement § 1109(C), and find that there are practical and compelling reasons which permit parents to prosecute abandonment actions under § 1130. Parents left without the right to institute abandonment actions under § 1130 would be faced with relying on the discretion of public authorities. Parents are closer to the familial situation than the state, and can serve just as importantly and efficiently in safeguarding their own and the state's interest in the children.

The most compelling reason for recognition of private use of § 1130 is the cross-pollination which is present in a clear reading of the provisions of 10 O.S.Supp.1983 § 1130 and 10 O.S.1981 § 60.6. These sections are not to be enforced separately— they must be enforced cumulatively. Title 10 O.S.Supp.1983 § 1130 delineates several circumstances under which parental rights may be terminated. The provisions of § 1130 do not mean that the state alone

**10.** In *Williams v. Williams,* the majority *sua sponte,* on a issue uncontested by the litigants interjected this issue.

**11.** The amended statutes, 10 O.S.Supp.1984 § 1109, provides in part:
"... B. If the parents, guardian, or other legal custodian of the child requests an attorney and is found to be without sufficient financial means, counsel shall be appointed by the court if the child is being proceeded against as a deprived child, a child in need of supervision, or a child in need of treatment, or if termination of parental rights is a possible remedy, provided that the court may appoint counsel without such request, if it deems representation by counsel necessary to protect the interest of the parents, guardian or

other legal custodian. Where necessary to protect the interests of the child the court shall appoint a separate attorney for the child regardless of any attempted waiver by the parent or other legal custodian of the child of the right of the child to be represented by counsel. Provided, that in any case where the child is alleged to be deprived and the court has not otherwise appointed a person to be guardian ad litem, the district attorney shall be deemed to be guardian ad litem for the child and shall protect the interest of the child.
C. The district attorney shall prepare and prosecute any case or proceeding within the purview of Chapter 51 of this title."

can institute an abandonment action or an action to terminate parental rights. On the contrary, 10 O.S.Supp. 1983 § 1130 A(1) allows a *minor* parent to terminate parental rights.[12] Section 1130(A)(1) specifically refers to § 60 in conjunction with § 1130 terminations. Under § 60.6(3)(a) there is an explicit saving clause which integrates § 1130.[13] Although it is not necessary to terminate parental rights under § 1130 if the conditions required under § 60.6 are met, this does not prevent § 1130 terminations from being used as a basis for adoption without consent under § 60.6. The statutes specific cross references belie the conclusion that they are to be construed separately, that is, § 1130 only in state instituted proceedings and § 60.6 only in private proceedings.

The best interest of the child standard arises statutorily under § 1130 and has, as a result of the cumulative effect of § 1130 and 60.6, been cross referenced to be used in adoption and custody proceedings. The removal of § 1130 from private interparental termination proceedings could mean that the best interest standard which is articulated solely in § 1130 could not be used in anything except § 1130 proceedings brought by the state. Obviously, this would violate legislative intent.

In *Wade v. Brown*, 516 P.2d 526 (Okla. 1973) the court examined the cumulative use of 10 O.S.1971 §§ 1130, 1131, 1134 and § 60.6. The Court held, acknowledging a fundamental rule of statutory construction, that § 60.6 permits combining an action to adopt with an action to terminate parental rights. The Court also found no violation of due process because the Code provided notice and opportunity to be heard before an adoption without consent.[14]

**12.** Title 10 O.S.Supp.1983 § 1130(A)(1) provides in pertinent part:
"A. The finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations: 1. Upon a written consent of a parent, including a parent who is a minor, acknowledged as provided in paragraph (5) of Section 60.5 of this title, who desires to terminate his parental rights; provided that the court finds that such termination is in the best interests of the child; or ..."

**13.** The savings clause is contained in 10 O.S. 1981 § 60.6 which states in part:
"A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock, without the consent of its mother, if living, except that consent is not necessary from a father or mother: ...
3. Who, for a period of twelve (12) months next preceding the filing of a petition for adoption of a child, has willfully failed, refused or neglected to contribute to the support of such child: ...
b. according to such parent's financial ability to contribute to such child's support if no provision for support is provided in a decree of divorce or an order of modification subsequent thereto; and where any of the above conditions exist it shall not be necessary to terminate parental rights under Section 1130 of this title prior to the adoption of said child. Provided that any decree of adoption heretofore entered by any court of appropriate jurisdiction within the State of Oklahoma wherein termination of parental rights, as prescribed

in Section 1130 of this title, was not obtained shall not be invalid on the ground that such termination of parental rights was not obtained."
This statute was amended in 1985 by H.B. 1308 to provide in part:
"A child under eighteen (18) years of age cannot be adopted without the consent of its parents, if living, except that consent is not required from ...
2. A parent who, for a period of twelve (12) months immediately preceding the filing of a petition for adoption of a child, has willfully failed, refused, or neglected to contribute to the support of such child: ...
b. according to such parent's financial ability to contribute to such child's support if no provision for support is provided in a decree of divorce or an order of modification, subsequent thereto; or and where any of the above conditions exist it shall not be necessary to terminate parental rights under Section 1130 of this title prior to the adoption of said child. Provided that any decree of adoption heretofore entered by any court of appropriate jurisdiction within the State of Oklahoma wherein termination of parental rights, as prescribed in Section 1130 of this title, was not obtained shall not be invalid on the ground that such termination of parental rights was not obtained; or ..."

**14.** Notice before adoption proceedings are provided in pertinent part in 10 O.S.Supp.1983 § 60.7:
"... Prior to a hearing on the application, notice shall be given the parent whose con-

## II

### MULLINS V. MULLINS PERMITS PRIVATE UTILIZATION OF 10 O.S.1981 § 1130

In *Mullins v. Mullins*, 606 P.2d 573 (Okla.1980),[15] a unanimous Court allowed a mother to initiate a proceeding to terminate the parental rights of the father under 10 O.S.Supp.1977 § 1130(A)(4), because the father wilfully failed to contribute to the support of the child. The Court said:

"... The statute clearly provides that, even if a child is declared delinquent, in need of supervision, or deprived, parental rights are not necessarily terminated, and that parental rights may expressly be terminated for wilful refusal to contribute to the children's support in accordance with a court order to do so. This is in conformity with the obvious intent of the statute. A child may be receiving excellent care from the custodial parent, while the noncustodial parent refuses to obey a court order to contribute to the child's support. It would be ludicrous and perhaps impossible to require a determination of deprivation or delinquency under these circumstances, and the irresponsible parent would not only be able to escape his responsibilities, but continue to enjoy the benefits of parenthood, including visitation, rights of inheritance and rights to the children's earnings. Such a result would not only

be inequitable and unconscionable, it would violate the statute."

The procedural posture of *Mullins* bears no relationship to its stature as controlling precedent here. The *Mullins* court was undivided, and the fact that an opinion did not arise from an adversary proceeding is insignificant. Its release for publication by the Supreme Court was a clear signal to the bench and bar that the *Mullins* doctrine controlled the relationship between § 60.6 and § 1130.[16]

Cardinal rules of statutory construction require that the language of the statutes be considered to ascertain legislative intent, and that different legislative enactments be construed cumulatively and harmoniously. This Court may not read exceptions into the statutes which were not made by the legislature.[17] In *McCain v. State Election Board*, 144 Okla. 85, 289 P. 759, 762 (1930) the Court held that because the Legislature had been in session for *two terms* since the statute had been construed, and at no time had seen fit to change the law, the Legislature had approved and ratified the construction given to the statute by the courts.[18] Since *Mullins* was promulgated, there have been *five* legislative sessions in which its teaching has been approved. The legislature had an opportunity to amend § 1130 in 1981, and again in 1983, and 1985 when it amended other portions of the Act without changing the applicable provision of § 1130. In *Lek-*

---

sent is alleged to be unnecessary. The notice of the application shall contain the name of each child for whom application for adoption is made, the date for hearing on the application, and the reason that said child is eligible for adoption without the consent of said parent ... The publication shall not be less than fifteen (15) days prior to the date of the hearing...."

**15.** This is also a requirement before a court may terminate a parents rights under § 1130. Notice requirements are provided in 10 O.S.1981 § 1131:

"A parent shall be given actual notice of any hearing to terminate his parental rights. The notice shall indicate the relief requested, and the hearing shall not be held until at least ten

(10) days after the receipt of such notice, except with the consent of the parent, if known."

**16.** See 12 O.S.Supp.1983 Ch. 15, App. 1, Rule 1.200.

**17.** *Hughes Drilling Co. v. Morgan*, 648 P.2d 32, 35 (Okla.1982). *Wade v. Brown*, 516 P.2d 526, 529 (Okla.1973).

**18.** *McCain v. State Election Board*, 144 Okla. 85, 289 P. 759, 762 (1930).

"(2.3) The Legislature has been in session for two terms since this construction was placed upon said statute, and at no time saw fit to change the law as construed by the state election board."

*an v. P & L Fire Protection Co.*, 609 P.2d 1289, 1292 (Okla.1980), the Court held:

"... Legislative familiarity with extant judicial construction of statutes in the process of being amended is presumed. Unless a contrary intent clearly appears or is plainly expressed, the terms of amendatory *acts which retain the same, or not substantially dissimilar, portions of provisions formerly in force will be accorded the construction identical to that placed upon them by preexisting case law ..."* (Emphasis supplied).

Section 60.6, as amended, deletes habitual drunkenness and judicial deprivation of custody as grounds for adoption without consent, restricts lack of consent to parents whose rights have been terminated pursuant to 1130 and 1131 of this "title of *this* Act", and to certain instances where the child is born out of wedlock. This is an explicit and concrete recognition by the Legislature of the *Mullins* doctrine.

The majoritys' argument would have some validity if the statutes had not been interpreted in *Mullins* and *Wade*, and if the legislature had not acquiesced and recently even more strongly endorsed, the application of § 60.6 and § 1130 in these cases. The dissenter's position in this case is squarely within permissable legislative boundaries. The refusal of the majority to follow *stare decisis* is not.[19] This Court consistently has allowed parents to terminate parental rights under § 1130 and has signaled private parties as well as the state that the Juvenile Code controls public and private termination proceedings. To recant now ignores controlling precedent, and creates chaos in the orderly administration of justice. Failure to consider jointly § 1130 and § 60.6 violates extant constitutional law, obvious legislative intent, and requires that *Wade* and *Mullins* be overruled—I am not willing to countenance any of these.

**19.** See H.B. No. 1308, 7 Okla.Sess.Laws 1521 (1985).